GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtgt.legal
MARK M. WEISENMILLER
Nevada Bar No. 12128
E-mail: mweisenmiller@gtg.legal
JONATHAN A. RICH
Nevada Bar No. 15312
E-mail: jrich@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*[Proposed] Attorneys for Debtor*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>LAS VEGAS MONORAIL COMPANY, a Nevada non-profit corporation,<br><br>       Debtor. | Case No.: BK-S-20-14451<br>Chapter 11<br><br><br>Date:  **OST REQUESTED**<br>Time:  **OST REQUESTED** |

## OMNIBUS DECLARATION OF CURTIS L. MYLES, III IN <u>SUPPORT OF FIRST DAY MOTIONS</u>

I, Curtis L. Myles, III, hereby declare, under penalty of perjury under the laws of the United States of America and the State of Nevada, as follows:

1.      I am over the age of 18 and am mentally competent. I am the President and Chief Executive Officer of Las Vegas Monorail Company ("**Debtor**") and have served in that capacity since July 18, 2005. In my capacity as Debtor's President and CEO, I am familiar with Debtor's business, operational, and financial affairs. I am authorized to submit this Declaration in support of the Debtor's motions for "first day" emergency relief ("**First Day Motions**").[1]

2.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review

---

[1] Unless otherwise noted, all capitalized undefined terms used herein shall have the meanings ascribed to them in the relevant First Day Motions.

of relevant documents, and information supplied to me by other members of Debtor's management and Debtor's various business and legal advisors.  If called upon to testify as to the content of this Declaration, I could and would do so.

3.      On September 7, 2020 ("**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned Chapter 11 case ("**Chapter 11 Case**").

4.      Debtor intends to operate its business and manage and preserve its properties as debtor-in-possession under Section 1107(a) and 1108.

5.      I am advised by counsel that this Court has jurisdiction over the Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in this United States Bankruptcy Court for the District of Nevada pursuant to 28 U.S.C. §§ 1408 and 1409.

## I.
## GENERAL BACKGROUND

A.      **Debtor's Business and Assets.**

6.      Debtor is a Nevada non-profit corporation that owns the Las Vegas Monorail, an approximately 3.9 mile monorail mass transit system located on the east side of Las Vegas Boulevard in Clark County, Nevada, including two parallel elevated tracks, seven elevated stations, an operations and maintenance building (the "**OMSF**"), nine automatic four car trains, and related equipment, facilities, and improvements (collectively, the "**System**").

7.      The System is operated on land owned by Clark County, Nevada (the "**County**") pursuant to rights of way and the Franchise Agreement (together with amendments thereto, the "**Franchise Agreement**") with the County, and on privately owned land pursuant to a ground leases and grants of easement.

B.      **Debtor's Prepetition Capital Structure.**

8.      *Prepetition Indenture and Loan.*  Pursuant to the *Indenture of Trust*, dated October 1, 2019 (the "**Indenture**"), by and between the Public Finance Authority, a unit of government and a body corporate and politic, established and existing under and by virtue of the laws of the State of Wisconsin, including Sections 66.0301, 66.0303 and 66.0304 of the State of Wisconsin

Statutes, as from time to time amended and supplemented (the "**Authority**"), and UMB Bank, N.A., a national banking association organized and existing under the laws of the United States of America, as trustee ("**UMB**"), the Authority issued the Public Finance Authority Revenue Bonds (Las Vegas Monorail) Series 2019A (the "**2019A Bonds**") and Public Finance Authority Revenue Bonds (Las Vegas Monorail) Series 2019B (the "**2019B Bonds**" and, collectively with the 2019A Bonds, the "**Bonds**"), to make a loan (the "**Conduit Loan**") to Debtor to (a) finance the cost of the acquisition, construction, improving, and/or equipping of a transportation project (the "**Sands Station**"), (b) refinance certain short-term indebtedness incurred by Debtor in the aggregate principal amount of $13,750,000 owed pursuant to that certain Loan Agreement dated as of July 12, 2019 (the "**Bridge Loan**"), to refinance certain of the costs of the acquisition, construction, improving and/or equipping the existing approximately 3.9 mile, 7-station, 9-train monorail along the east side of the Las Vegas Strip owned and operated by Debtor ("**Existing Monorail**"), and (c) and other costs required in connection therewith.  Debtor as a non-profit corporation issued the Bonds as tax-free bonds.

9.      *The Conduit Loan*.  The Conduit Loan was in the initial principal amount of $20,500,000.00, of which $20,400,000.00 was to accrue interest at the rate of interest applicable to the 2019A Bonds from the Date of Delivery, $100,000.00 shall accrue interest at the rate of interest applicable to the 2019B Bonds from the Date of Delivery, and an amount of up to $13,115,000.00, to the extent drawn down on the 2019B Bonds Final Draw Down Date, shall accrue interest at the rate of interest applicable to the 2019B Bonds from the 2019B Bonds draws.

10.      *Bondholder*.  The sole purchaser of the Bonds was Preston Hollow Capital, LLC Bonds ("**PHC**") which as of the Petition Date remains the sole holder of the Bonds.

11.      *Additional Financing Documents*.  In addition to the Indenture, the following financing documents were executed:

  a.  The Authority and Debtor entered into the *Financing Agreement*, dated October 1, 2019 (the "**Bonds Financing Agreement**"), specifying the terms and conditions of the Conduit Loan;

b. The Debtor and the Authority entered into the *Tax Agreement*, dated October 10, 20129 (the "**Tax Agreement**") regarding the tax treatment for the Bonds; and

c. The Debtor, UMB, PHC and Wells Fargo Securities, LLC, as the Underwriter, entered into the *Agreement to Advance* dated as of October 1, 2019 (the "**Agreement to Advance**"), regarding the advancement of the Conduit Loan.

12.    True and correct copies of the Indenture, Bonds Financing Agreement, Tax Agreement and Agreement to Advance are attached hereto as **Exhibit 1**, **2**, **3** and **4**, respectively.

13.    *Prepetition Security Interests and Prepetition Collateral*.  Debtor, as grantor, and UMB executed the following security documents for the Conduit Loan;

a. *Security Agreement* dated October 10, 2019 (the "**Bonds Security Agreement**"), to secure the payment and performance of the Secured Obligations (as defined in the Bonds Security Agreement) in which Debtor unconditionally granted to UMB for the benefit of the UMB and PHC, a continuing security interest in all property of Debtor, whether real or personal, tangible or intangible, now owned or hereafter acquired or arising and wherever located, including, without limitation, all of Debtor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located, including, but not limited to, all of Debtor's real or personal property, equipment, inventory, money, accounts, Accounts and Deposit Accounts (as those terms are defined in the Bond Security Agreement);

b. *UCC -1 Financing Statement* filed with the Nevada Secretary of State on October 10, 2019 ("**Bonds UCC-1 Financing Statement**");

c. *Collateral Assignment of Easements* entered into as of October 10, 2019 (the "**Easements Assignment**") assigning the easements scheduled therein as collateral for the Conduit Loan; and

d. *Collateral Assignment of Contract* entered into as of October 10, 2019, assigning for security purposes the Franchise Agreement to UMB (the "**Contract Assignment**" and together with the Indenture, Bonds Financing Agreement, Tax

Agreement, Agreement to Advance, Bonds Security Agreement, Bonds UCC-1 Financing Statement, and Easements Assignment, the "**Bonds Loan Documents**").

14. True and correct copies of the Bonds Security Agreement, Bonds UCC-1 Financing Statement, and Easements Assignment are attached hereto as **Exhibit 5**, **6**, **7**, and **8**. As detailed below, the Debtor maintains a series of Bank Accounts, including both Unrestricted Bank Accounts and Restricted Bank Accounts. UMB's perfected security interest extends to the Restricted Bank Accounts by virtue of control agreements executed by and between the Debtor and UMB.

15. *Prepetition Conduit Loan Obligations*. As of the Petition Date, the aggregate principal amount outstanding under the Conduit Loan was $20,500,000.

16. *EIDL Loan*. Pursuant to that certain *Loan Authorization and Agreement,* dated June 15, 2020 ("**EIDL Loan Agreement**")*,* the U.S. Small Business Administration ("**SBA**") authorized an Economic Injury Disaster Loan to Debtor in the amount of $150,000 ("**EIDL Loan**").

17. *EIDL Note*. In return for the EIDL Loan, Debtor promised to pay to the order of the SBA $150,000, interest on the unpaid principal balance and all other amounts required under the *Note*, dated June 15, 2020 ("**EIDL Note**").

18. *EIDL Security Agreement*. Debtor also executed a *Security Agreement*, dated June 15, 2020 ("**EIDL Security Agreement**") under which Debtor granted the SBA a security interest in the all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The EIDL Security Interest does not extend to the Bank Accounts.

19. *EIDL UCC -1 Financing Statement.* The SBA filed with the Nevada Secretary of State on July 2, 2020 a *UCC-1 Financing Statement* ("**EIDL UCC-1 Financing Statement**," and together with the EIDL Loan Agreement, EIDL Note, and EIDL Security Agreement, the "**EIDL**

**Loan Documents**").  True and correct copies of the EIDL Loan Documents are attached hereto as **Exhibits 9**, **10**, **11**, and **12**.

20.    The SBA has no perfected security interest in the Bank Accounts (defined below).

**C.    Events Leading to the Filing of the Chapter 11 Case.**

21.    In October 2019, based upon the strength of the performance of the System at the time and on projections of System performance, Debtor secured the Conduit Loan.

22.    As part of the cash flow projections supporting the Conduit Loan, Debtor demonstrated its ability to meet annual maintenance and operational expenses, as well as longer term capital expense.  The long-term needs included replacement of the System's radio communication system (approximately $2,500,000), fare collection system (approximately $6,000,000), station elevators and escalators (from $7,000,000 to $10,000,000), among other replacements.  Debtor had also begun the process of determining the financing structure of the replacement of Monorail trains, expected to begin replacement in 2034 at an anticipated cost of approximately $190,000,000.  Debtor began 2020 with increases in ridership and revenue, with ticket sales through the first two months of the year up over 7%.  Through March 18, 2020, when System operations were suspended, Debtor saw a net operating gain of nearly $1.6 million, a 48% increase over 2019.

23.    Although the first reported COVID-19 case in Nevada occurred on February 26, 2020, and as information on the spread of the virus increased on a daily basis, the strong System performance continued into the first two weeks of March 2020 with tickets sales during just the first two weeks of March 2020 nearly equaling total sales for all of March 2019.  However, as reports of the rate of infections and fatalities grew, state and local governments began to react to what was clearly becoming a national and global medical emergency.  The tourism and convention market in Las Vegas suddenly began a steep decline.  As reported cases grew in Nevada, the state and local governments issued a number of orders closing businesses and restricting gatherings, including resort hotels, convention facilities, shopping, dining, showroom and concert venues.  Nationally, federal authorities instituted a number of travel restrictions, limiting domestic and international flights.  Collectively, these myriad governmental orders and restrictions within mere days worked to severely dampen visitation to Las Vegas.

24.     On March 18, 2020, after Governor Sisolak issued orders to close all non-essential businesses, all hotels, restaurants, showrooms, shopping and entertainment venues along the Las Vegas Strip, including those connected to the System, shut down.  The Governor's orders also caused the cancellation of nearly all conventions through January 2021; and delayed openings of other large tourism-based projects like the MSG Sphere Entertainment venue and the 3500 room Resorts World Las Vegas Hotel.  With the System's normal ridership demographic consisting of well over 95% visitors, and visitation reduced to nearly zero, Debtor made the obvious decision to close the System on March 18, 2020, lay off 93% of its staff, reduce the compensation of remaining staff by up to 30%, eliminate fees paid to its board of directors, and cut maintenance and operational expenses to the bare minimum needed to maintain the value and operability of the System.  With no realistic projection on when visitation and other Las Vegas Strip area business will return to pre-pandemic levels, Debtor was forced to rely on cash reserves moving forward for the foreseeable future.

25.     On March 31, 2020, Debtor had $1.12 million in unrestricted cash with which to maintain the System in closed status.   By August 31, 2020, nearly all of the unrestricted cash had been exhausted.

26.     Even with the resumption of revenue operations, without a return to pre-COVID-19 economic activity in Las Vegas, including domestic and international air travel, dining and shopping offerings, large scale conventions, concerts, sporting and other special events, Debtor cannot achieve an operating profit.

27.     Moreover, by 2034, Debtor's needs for the replacement and repair of its capital assets ("**Capital Expenditure**" or "**CapEx**"), including replacement of the nine automated four-car trains, tracks, and related equipment, will exceed $250,000,000.

## II.
## PROPOSED SALE OF DEBTOR'S ASSETS ON AN ACCELERATED TIMELINE

28.     The Las Vegas Convention and Visitors Authority ("**LVCVA**" or "**Stalking Horse Bidder**") desires to purchase all of Debtor's rights, title and interest in all assets owned by Debtor and used in connection with the ownership and operation of, or associated with, the System, including the assignment of the OMSF lease, as set forth in the that certain *Asset Purchase Sale*

*Agreement*, dated September 2, 2020 ("**Stalking Horse Agreement**") by and between Debtor and LVCVA.

29.    Debtor desires to sell to LVCVA, or any other Successful Bidder on substantially similar terms as those set forth in the Stalking Horse Agreement.

30.    The transactions contemplated by the Stalking Horse Agreement are conditioned upon the Chapter 11 Case being commenced and proceeding under Chapter 11 of the Bankruptcy Code, subject to and consummated only pursuant to the approval of the Bankruptcy Court of such sale free and clear of any interest in such property, all as more specifically provided in the Stalking Horse Agreement, and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bid Procedures (defined in the Stalking Horse Agreement).

31.    As such, contemporaneously with the filing of the Chapter 11 Case, Debtor filed *Debtor's Motion Pursuant to Sections 105(a), 363, 365, 503(b), and 507(a)(2) of the Bankruptcy Code: (I) Approving Bidding Procedures for the Sale of Substantially all Assets of Debtor, Scheduling an Auction and Sale Hearing, and Approving the Form and Manner of Notice Thereof; (II) Approving the Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Certain Related Executory Contracts; (IV) Waiving the Requirements of Bankruptcy Rules 6004(h) and 6006(d), and (V) Granting Related Relief* ("**Bid Procedures and Sale Motion**"), which requests this Court: (1) enter a Bidding Procedures Order (defined in the Bid Procedures and Sale Motion), substantially in the form attached thereto as Exhibit 1, approving bidding procedures for the sale of the Sale Assets and the over-bid protections for the LVCVA, setting an auction and sale hearing date, and approving notices and other relief related to the foregoing; (2) following a final hearing, entry of one or more orders, authorizing and approving sales free and clear of all liens (statutory or otherwise), claims, interests, and encumbrances of every kind and nature with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds, the assumption and assignment of related executory contracts and unexpired leases, and waiving of the requirements of Bankruptcy Rules 6004(h) and 6006(d); and (3) grant such other and further relief as is just and proper.

32.      An accelerated sale process is required for several reasons.  First, Debtor faces liquidity constraints that necessitate an accelerated sale process.  Prior to the Petition Date, Debtor was able to obtain the Stalking Horse Deposit (defined in the Stalking Horse Agreement) from the LVCVA which has allowed Debtor to fund this Chapter 11 Case and minimal operations through November 30, 2020.  Without the sale closing prior to November 30, 2020, or another infusion of money, Debtor will no longer have the wherewithal to continue its limited operations and maintain the value of its assets.

33.      Given that the Debtor will not generate any revenue for the foreseeable future, the lack of fair market value of the Monorail over and above the Conduit Loan and EIDL Loan, and the requirements under Section 364 of the Bankruptcy Code for obtaining post-Petition Date financing, Debtor is not able to obtain financing during the Chapter 11 Case and operate past November 30, 2020.  Debtor did receive an offer to provide debtor-in-possession financing in an unstated amount to sustain operations during a Chapter 11 Case as a "priming loan" ahead of the Conduit Loan and EIDL Loan.  PHC dismissed this out-of-hand.  Given the inability to provide adequate protection as I understand the concept, any form of a debtor-in-possession loan is not feasible.

34.      Grants of easements for rights-of-way and stations by Harrah's and Imperial Palace to Debtor automatically terminate if the System is owned or operated by a for-profit entity.

35.      The ownership of the Assets by an entity other than a governmental entity or a non-profit will eliminate the tax-free nature of the Bonds and require the immediate refinance of the Bonds.

36.      Thus, a sale to the LVCVA – a government agency, established by Nevada state law, funded by a County room tax and governed by an autonomous board of directors – is the best and likely the only feasible option for Debtor.  Debtor intends to seek other Qualified Bidders to compete in the Auction of the Sale Assets.

37.      Given Debtor's current financial condition, the existing pre-petition and post-petition marketing of Debtor's business, the implications if sold to a for-profit entity, and the fact that a sale on the terms set forth in the Stalking Horse Agreement would result in satisfaction of substantially all of Debtor's pre-petition liabilities and allow for the resumption of the Monorail operations when

feasible, Debtor believes that the terms of the Stalking Horse Agreement and the required timeline are both reasonable and necessary under the circumstances of the Chapter 11 Case and in the best interests of Debtor's estate and creditors.

### III.
### FIRST DAY MOTIONS

38.     Debtor filed or expects to file the First Day Motions described below.  The following is only intended to be a summary of the First Day Motions.  The full grounds for the relief sought in the First Day Motions is set forth in each of the same.

39.     Debtor filed its First Day Motions to allow it to efficiently and effectively operate in its Chapter 11 Case.  The relief sought in the First Day Motions is critical to Debtor's limited business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that Debtor is able to maintain and preserve the value of its assets to sell for the benefit of its estate and creditors.

40.     The First Day Motions seek relief to allow Debtors to meet necessary obligations and fulfill its duties as debtor-in-possession and minimize the adverse effects of the Chapter 11 filings on its businesses.  I am familiar with the contents of each First Day Motion and believe the relief sought therein is (i) necessary to enable Debtor to maintain its limited business operations during the pendency of the Chapter 11 Case with minimal disruption or loss of productivity and value, (ii) critical to achieving a successful liquidation of Debtor's assets, and (iii) in the best interests of Debtor, its estate and all stakeholders.

**A.     Emergency Motion for Interim and Final Orders: (I) Authorizing Debtors to Pay Wages, Salaries, Benefits, and Other Employee Obligations; and (II) Authoring and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations.**

41.     In the *Emergency Motion for Interim and Final Orders: (I) Authorizing Debtors to Pay Wages, Salaries, Benefits, and Other Employee Obligations; and (II) Authoring and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* ("**Wages Motion**"), Debtor requests entry of interim and final orders: (a) authorizing, but not directing, Debtor to continue to honor and pay (i) all prepetition employee obligations, as described

more fully therein and (ii) all prepetition federal and state withholding obligations; (b) authorizing and directing banks and financial institutions to honor and process checks and transfers related to such payments; and (c) providing any additional relief in order to effectuate the foregoing.

42.     As of the Petition Date, Debtor employed approximately nineteen employees ("**Employees**") in the ordinary course of its business.  Continued service by the Employees is vital to the value and preservation of Debtor's assets.

43.     As of the Petition Date, the Employees were owed or had accrued in their favor, various sums from Debtor for wages and salaries incurred in the ordinary course of Debtor's business, including any prepetition compensation (collectively, "**Wage Obligations**").  The total estimated amount of Wage Obligations that will have accrued, but remain unpaid, as of the Petition Date is approximately $5,380.16.  Debtor pays its Employees on a bi-weekly payroll cycle.  Debtor's last payroll was made on September 6, 2020 for wages accrued through August 22, 2020.  The next payroll is due to be made on September 26, 2020, for the 14-day period beginning September 6 and ending September 20, 2020 and will total approximately $75,322.22.

44.     Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities.  To the extent that Debtor has deducted funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and FICA contributions attributable to Wage Obligations, which are due but have not been paid yet to any governmental entity, Debtor seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business.

45.     In addition, Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance and workers, and compensation obligations ("**Tax Obligations**").  Debtor seeks authorization to continue to pay these funds in the ordinary course of business.  The total estimated amount of Tax Obligations that will have accrued, but remain unpaid, as of the Petition date is approximately $411.58.

46.     In addition, in the ordinary course of its business, Debtor has accrued amounts for health insurance programs pertaining to services rendered by the Employees prior to the Petition Date ("**Employee Benefit Plans**").   These employee benefit contributions ("**Employee Benefit Contributions**," together with the Wage Obligations, Tax Obligations, Employee Benefit Plans, and Employee Benefit Contributions, "**Employee Obligations**") are an integral part of the compensation to which the Employees are entitled.   The amount of Employee Benefit Contributions which will have accrued, but will remain unpaid, prior to the Petition Date is estimated to be approximately $20,522.

47.     Debtor's Employee Obligations to be paid to or for the benefit of each of the Employees pursuant to the request will not exceed $13,650 per employee, consistent with the cap provided in Section 507(a)(4).

48.     If Debtor is unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that certain essential Employees will resign and that those Employees that remain will be discontented.

49.     Debtor will have sufficient cash to honor all of the foregoing employee related obligations.

50.     Continued payment of Employee Obligations is essential to preserve the morale and to maintain positive relations between Debtor and its Employees.   If the relief requested is not granted, the success of Debtor's Chapter 11 Case will be placed in substantial jeopardy.   Thus, the relief requested is in the best interests of Debtor, its Estate, and its creditors.

51.     If the outstanding Employee Obligations are not immediately satisfied, Debtor will experience immediate and irreparable harm.

…

…

…

**B.      Debtor's Motion for Interim and Final Orders (I) Authorizing Maintenance of Prepetition Cash Management System and Bank Accounts; and (II) Granting Related Relief.**

52.      In the *Motion for Interim and Final Orders: (I) Authorizing Maintenance of Prepetition Cash Management System and Bank Accounts; and (II) Granting Related Relief* ("**Bank Accounts Motion**"), Debtor requests interim and final orders granting all of the following relief:

a.      that Debtor is authorized and empowered to: (1) maintain its Cash Management System and continue to use all of its Bank Accounts in existence as of the Petition Date; (2) treat the Bank Accounts for all intents and purposes as debtor-in-possession accounts; (3) use, in their present form, existing checks and other documents related to the Bank Accounts; (4) pay prepetition and postpetition ordinary course bank fees in connection with the Bank Accounts; and (5) perform their obligations under the documents and agreements governing the Bank Accounts;

b.      that Debtor maintains records of all transfers and transactions within the Cash Management System so that all transfers and transactions are adequately and promptly documented in, and ascertainable and traceable from, Debtor's Accounting Systems;

c.      that all Banks at which Debtor maintains Bank Accounts are authorized and directed to: (1) continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prior to the Petition Date without interruption and in the usual and ordinary course; and (2) pay any and all checks, drafts, wires, automated clearinghouse (ACH) transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank. Accounts (collectively, "**Debits**") on account of a claim arising on or after the Petition Date so long as there are sufficient collected funds in the relevant Bank Accounts and in accordance with the agreements governing said Bank Accounts, including, without limitation, any prepetition cash management agreements, merchant service agreements, or treasury services agreements;

d.      that no Debits issued on the Bank Accounts prior to, but presented after, the commencement of Debtor's Chapter 11 Case are honored or paid, other than the Permitted Checks (defined below) explicitly provided for herein, or as otherwise permitted by Court order after notice and a hearing;

e.      that the Debtor will promptly provide the Banks with a list of pre-Petition Date checks that the Banks are authorized to honor ("**Permitted Checks**").  If an employee or vendor that was issued a Permitted Check refuses or is otherwise unable to re-present the prepetition check for payment, Debtor is authorized to issue a replacement check or cashier's check, as requested by such employee or vendor;

f.      that those certain existing deposit agreements between Debtor and its existing Banks shall continue to govern the postpetition cash management relationship between Debtor and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect;

g.      that Debtor and the Banks may, without further order of this Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts;

h.      that nothing contained in this Motion or its subsequent order may prevent Debtor from closing the Bank Accounts as they deem necessary and appropriate;

i.      that Debtor reimburses the Banks for any claim arising prior to or after the Petition Date in connection with Debits deposited with the Banks which have been dishonored or returned for insufficient funds in the applicable accounts;

j.      that each Bank that maintained one or more Bank Accounts implements reasonable handling procedures to effectuate the terms requested in this Motion. Debtor requests that no Bank that implements such handling procedures be liable to Debtor or its estate, or otherwise held in violation of this Motion or its subsequent order, for honoring a prepetition Debit or other Debit: (1) at the direction of Debtor that such prepetition Debit or other Debit be honored; (2) in the good faith belief that the Court has authorized that such prepetition Debit or other Debit be honored; or (3) as a result of an innocent mistake made despite implementation of such handling procedures;

k.      that the relief, rights, and responsibilities requested herein and granted in the order are deemed to apply to any and all Bank Accounts maintained in Debtor's name;

l.      that, to the extent any other order (if any) is entered directing a Bank to honor Debits made, drawn, or issued in payment of prepetition claims, the obligation to honor such items are subject to the order granting this Motion;

m.      that Debtor and the Banks are authorized and directed to continue to perform pursuant to the terms of any prepetition documents and agreements governing the Bank Accounts, except and to the extent otherwise directed by the terms of the order;

n.      that the Banks are authorized to continue offsetting any funds deposited in the Bank Accounts by Debtor to the extent necessary to cover any fees, charges, and assessments set forth or provided for in the agreements governing the Bank Accounts or as otherwise permitted in the ordinary course of business pursuant to the agreements governing the Bank Accounts;

o.      that Debtor and the CC Processors are authorized to perform their obligations pursuant to the terms of the agreements between Debtor and the CC Processors. Debtors seek authorization to do and perform all acts, to make, execute, and deliver all instruments and documents, and to pay fees, charges, and expenses which may be required or necessary for Debtor's performance under any agreements with the CC Processors; and

p.      that the Restricted Bank Accounts shall remain as is and in place as they were prior to the Petition Date.

53.      Debtor has one centralized cash management system ("**Cash Management System**") to collect and transfer funds generated by its operations and to disburse those funds to satisfy the obligations required to operate its business.

54.    In the ordinary course of its business, Debtor utilizes the Cash Management System to efficiently collect, transfer, and disburse funds generated through Debtor's operations.

55.    Debtor has the following six unrestricted bank accounts (together, the "**Unrestricted Bank Accounts**"):

- Bank of Nevada - Operating Account – x2207 – ("**Operating Account**") is utilized for processing checks/vendor payments for operating expenditures.  The Operating Account is utilized as the "house account" for the ZBA activities related to the Payroll and Collection Account (defined below).

- Bank of Nevada – Payroll Account – x2304 – ("**Payroll Account**") is utilized for processing payroll expenditures.  The Payroll Account is a ZBA account and each night pulls funding during a deficit from the Operating Account or sweeps into the Operating Account during a surplus.

- Bank of Nevada – Collection Account – x2355 – ("**Collection Account**") is utilized for check deposits and incoming funds.  The Collection Account is a ZBA account and each night pulls funding during a deficit from the Operating Account or sweeps into the Operating Account during a surplus.

- Bank of Nevada – Debit Card Account – x8101 – ("**Debit Card Account**") is an inactive that has a $0 balance.

- Bank of Nevada – LVMC – General Fund – x6185 – ("**General Fund Account**") was opened pursuant to the Indenture.  The General Fund Account has a $0 balance and is inactive.

- Bank of Nevada – LVMC – Reimbursement – x5283 – ("**Reimbursement Account**") is utilized to house reimbursements from Harrah's Las Vegas LLC related to the *Temporary Closure and Temporary Construction License Agreements*.

56.    Bank of Nevada is an "authorized depository".

57.    Debtor also has the following ten restricted bank accounts ("**Restricted Bank Accounts**," and together with the Unrestricted Bank Accounts, the "**Bank Accounts**"):

- Wells Fargo, N.A. ("**Wells Fargo**") – Removal Costs Escrow Fund – x2520 – was

opened to house removal costs of tearing down the System.

- UMB Bank, N.A. ("**UMB**," and together with Bank of Nevada and Wells Fargo, the "**Banks**') (Restricted) – Public Finance Authority Revenue Bonds (LVMC) Series 2019A&2019B – x0601 – was opened to house the following restricted reserve accounts pursuant to Indenture:

   - PFA Revenue Bonds – Revenue Fund – was opened pursuant to Section 5.09 of Indenture to house all amounts transferred to UMB from the Collection Account pursuant to Section 4.3 of Bonds Financing Agreement;

   - PFA Revenue Bonds – Construction Fund – was opened pursuant to Section 5.08 of the Indenture for purpose of paying amounts owed under the construction agreements and other costs of Sands station;

   - PFA Revenue Bonds – Debt Service Interest Sub Account – was opened pursuant to Indenture to receive monthly deposits to make semi-annual interest payments;

   - PFA Revenue Bonds – Debt Service Principal Sub Account – was opened pursuant to Indenture to receive monthly deposits to make semi-annual principal payments, as applicable;

   - PFA Revenue Bonds – Reserve Account – was opened pursuant to Indenture Section 5.11 that houses DSRF A and DSRF B (defined in the Indenture) of $1,694,062 and $10,662, respectively;

   - PFA Revenue Bonds – Supplemental Reserve Fund – was opened pursuant to Section 5.13 of Indenture for allowing funds to be withdrawn from time to time to deposit into Debt Service Fund (defined in the Indenture) to make scheduled payments of principal and interest on the Bonds due on the respective payment date in the event insufficient amounts are available in the Debt Service Fund;

   - PFA Revenue Bonds – Operating Reserve Fund – was opened pursuant to Section 5.12 of Indenture for purpose of reserving for and paying O&M costs in an amount equal to the Operating Reserve Requirement (defined in the

Indenture).

- PFA Revenue Bonds – Capital Expenditure Reserve Fund – was opened pursuant to Section 5.14 of the Indenture for the purpose of reserving for and paying for Capital Expenditures (defined in the Indenture);

- PFA Revenue Bonds – Cost of Issuance Fund – Trustee is directed to make payments from the COI fund to pay Costs of Issuance of the 2019A Bonds and the 2019B Bonds (as those terms are defined in the Indenture).

58.    Wells Fargo Bank is an "authorized depository".

59.    The Restricted Bank Accounts are subject to six deposit account control agreements related to the issuance of the Bonds pursuant to the Conduit Loan.

60.    As provided for in the Bonds Loan Documents, the Restricted Bank Accounts shall remain as is and in place as they were prior to the Petition Date.

61.    The Bank Accounts tie into and provide data to Debtor's Accounting System (defined hereinafter) to accurately record such collections, transfers, and disbursements as they are made.

62.    Specifically, Debtor utilizes Sage 100 Advanced 2018 (Version 6.00.3.0) – Sage Software, Inc. ("**Accounting System**").

63.    Additionally, Debtor has agreements with credit card processing companies (i) Worldpay (Vantiv/Fifth Third - Ticket Vending Machines (TVM) Processing; (ii) TrustCommerce – eCommerce – except Google Pay; (iii) Stripe – eCommerce – only Google Pay; and (iv) Mercury – Point of Sale (POS) system (together, "**CC Processors**").

64.    Allowing Debtor to maintain its Cash Management System and Bank Accounts will help to ease the transition into chapter 11 and eliminate the administrative burden of opening new accounts. Without the relief requested herein, Debtor would be required to close its existing Bank Accounts, open new bank accounts at cooperating depositories and imprint checks with the "Debtor-in-Possession" label. Complying with such requirements will needlessly burden Debtor without a corresponding benefit to parties in interest.

65.     Debtor's Cash Management System is an ordinary, usual, and important business practice.  The Cash Management System enables Debtor to maintain control over the receipt and disbursement of cash, and to generate timely and accurate financial information critical to managing Debtor's business during the pendency of the Chapter 11 Case.  If these practices and procedures are disrupted, Debtor's effort to reorganize may be jeopardized.

66.     Debtor's Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity.  Many corporate enterprises use these cash management systems because such systems provide numerous benefits.  Among the most important of these benefits is the ability to control corporate funds and ensure cash availability, to reduce the cost of borrowed funds, to reduce administrative expenses, and to have easy access to timely and accurate financial information.

67.     Establishing a new cash management system would entail significant delay and cost, particularly considering the Cash Management System's complexity and reliability.  At a minimum, substantial disruptions to Debtor's business would occur by, among other things, delaying collection and disbursement of the payments to vendors, employees, and customers.  This would in turn harm stakeholder confidence, thus disrupting mutually beneficial relationships with trade creditors, customers, and employees, among others. Such a negative impact on Debtor's operations would hinder a successful sale of its assets and/or reorganization in Chapter 11.

68.     Maintaining the existing Cash Management System would not prejudice any party. Debtor will maintain strict records with respect to all transfers of cash so that it is able to readily account for all transactions.  Debtor's maintenance of its existing Cash Management System is not only of critical importance to Debtor's business operations but is also in the best interests of Debtor's estate and creditors.

69.     If the Cash Management System or Bank Accounts are disrupted, Debtor will experience immediate and irreparable harm.

70.     To require Debtor to close the Bank Accounts and to open new bank accounts would cause substantial disruption and delay in Debtor's ongoing operations and would materially and adversely affect Debtor's limited business operations and the value of its assets.  To avoid

such problems and to ensure a smooth transition into Chapter 11, it is imperative that Debtor be permitted to continue using its Bank Accounts.

71.    If the Cash Management System or Bank Accounts are disrupted, Debtor will experience immediate and irreparable harm.

72.    In view of the urgency of the relief requested herein and the risk to Debtor's operations if Debtor's Cash Management System or Bank Accounts are interrupted, a fourteen-day stay of the relief sought herein is impractical.

**C.    Debtor's Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Critical Vendors; and (II) Granting Related Relief.**

73.    In the *Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Critical Vendors; and (II) Granting Related Relief* ("**Critical Vendors Motion**"), Debtor seeks entry of interim and final orders (a) authorizing, but not requiring, Debtor to pay, in its discretion, all or part of the claims of the critical vendors listed on Exhibit 3 to the Critical Vendor Motion ("**Critical Vendor Claims**"); (b) authorizing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to the Critical Vendor Claims described in the Critical Vendors Motion; and (c) authorizing Debtor to issue new postpetition checks, or effect new fund transfers, to replace any prepetition checks or fund transfer requests that may be dishonored or rejected in connection with obligations owed to the Critical Vendors.

74.    The Critical Vendors provide products and/or services without which Debtor cannot successfully preserve and operate the System and which services Debtor could not replace without suffering imminent harm to its operations.  This is so because Thales Transport & Security, Inc. provides Debtor with maintenance and software support for the System's automated train control software, along with technical support for Debtor's critical radio and train communication equipment as the Original Equipment Manufacturer.  Similarly, KONE Inc. provides preventative and corrective maintenance services for the escalators and elevators, for which it is the Original Equipment Manufacturer for 95% of, at all of Debtor's seven separate stations and supporting

maintenance facility.  The escalators and elevators serve a pivotal role as they are used to transport passengers from the ground and mezzanine levels to the station platform level.

75.    To preserve the value of Debtor's assets and its value as an ongoing concern, Debtor must have the ability to fund and maintain its limited operations, which includes paying and receiving products and/or services from the Critical Vendors.

76.    The Critical Vendors may not continue to provide the products and/or services as a result of the Chapter 11 Case.  In fact, the Critical Vendors may not continue to provide services until their pre-Petition Date claims are paid.  Were the Critical Vendors to withhold such products and/or services, Debtor's limited operations and the value of its assets would be jeopardized, and the recoveries of all creditors would be placed in jeopardy.

77.    It is unlikely that other software and maintenance providers could replace the services provided by the Critical Vendors, considering the Critical Vendors are the Original Equipment Manufacturers and the circumstances of the Chapter 11 Case.  As to Thales, if it discontinues providing service and Debtor has an issue that requires its support, the System's operations will cease.

78.    If the Critical Vendors fail to provide further products and/or service, it is unlikely Debtor will be able to escape the immediate and irreparable harm.  Without the products and/or services of the Critical Vendors, Debtor could be out of business.

79.    As of the Petition Date, the Critical Vendors' prepetition claims amount to $115,601 ("**Claims**").

80.    If Debtor is unable to take the necessary steps to ensure that its Critical Vendors are paid, it will suffer imminent harm to its operations that Critical Vendors provide products and/or services in support of, without which Debtor cannot successfully operate and which services Debtor could not replace without suffering imminent harm to its operations.

81.    Debtor will have sufficient cash to honor all of the Critical Vendors' prepetition Date claims.

82.    Payment of the Critical Vendors Claims are essential to sustain Debtor's limited operations and maintaining the value of its assets.  If the relief requested is not granted, the success

of Debtor's Chapter 11 Case will be placed in substantial jeopardy.  Thus, the relief requested is in the best interests of Debtor, its Estate, and its creditors.

83.    Debtor has budgeted for this expense and has sufficient cash on hand to meet its ongoing obligations while it pursues the sale of the System.

84.    If the outstanding Critical Vendors' prepetition claims are not immediately satisfied, Debtor will experience immediate and irreparable harm.

**D.    Motion of Debtor for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, Debtor on Account of Prepetition Amounts Due; (II) Deeming Utility Providers Adequately Assured of Future Performance; (III) Authorizing Debtor to Establish the Adequate Assurance Deposit Accounts and Pay the Adequate Assurance Deposits; (IV) Establishing Procedures for Objection to the Adequate Assurance Procedures; and (V) Granted Certain Related Relief.**

85.    In the *Motion of Debtor for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, Debtor on Account of Prepetition Amounts Due; (II) Deeming Utility Providers Adequately Assured of Future Performance; (III) Authorizing Debtor to Establish the Adequate Assurance Deposit Accounts and Pay the Adequate Assurance Deposits; (IV) Establishing Procedures for Objection to the Adequate Assurance Procedures; and (V) Granted Certain Related Relief* ("**Utilities Motion**"), Debtor seeks entry of an interim order substantially in the form attached thereto as Exhibit 2 ("**Interim Order**"): (i) prohibiting the Utility Providers from altering, refusing, or discontinuing service to Debtor on account of unpaid amounts for prepetition utility services, including the making of demands for security deposits or accelerated payment terms, pending entry of a final order granting the relief sought therein in substantially the form attached thereto as Exhibit 3 ("**Final Order**"); (ii) providing that the Utility Providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code based, *inter alia*, upon Debtor establishing a segregated account containing an amount equal to fifty percent (50%) of Debtor's estimated average monthly cost of utility service, which may be adjusted by Debtor for reasons specified herein; (iii)

1 establishing procedures for resolving requests for additional adequate assurance and objections to

2 the Utilities Motion; and (iv) authorizing, but not directing, Debtor to provide additional adequate

3 assurance of payment to the Utility Providers if required.

4       86.    Uninterrupted utility services are essential to Debtor's ongoing operations and the

5 value of its assets. A disruption of these services would likely be costly to Debtor and harmful to

6 its business and the value of its assets, as Debtor would be forced from the outset of the Chapter

7 11 Case to focus on finding replacement Utility Providers and services, where possible, rather than

8 focusing on efforts to preserve and maximize the value of Debtor's estate. Moreover, the business

9 disruption that would likely result from interruption of these services would likely damage

10 customer relationships, revenues, and profits and could adversely affect Debtor's efforts in the

11 Chapter 11 Case, to the detriment of its estate, creditors, and employees. It is therefore critical

12 that all utility services currently provided to Debtor continue uninterrupted.

13       87.    In connection with the operation of its business and management of its property,

14 Debtor incurs utility expenses in the ordinary course of business for, among other things, water,

15 sewer service, electricity, gas, local and long-distance telecom service, internet service, waste

16 disposal and other similar services (together, "**Utility Services**"). On a monthly basis, Debtor

17 spends approximately $23,000 per month on Utility Services. A non-exhaustive list of Debtor's

18 Utility Providers, as of the Petition Date, is attached to the Utilities Motion as Exhibit 1.[2]

19       88.    Therefore, the Adequate Assurance Deposit by Debtor will be $11,500.

20 …

21 …

22 …

23 …

24

---

25 [2] While Debtor has exercised its best efforts to list all of its Utility Providers and account numbers in Exhibit 1, it is possible that certain Utility Providers and/or account numbers may have been omitted from this list. Debtor reserves

26 the right to amend Exhibit 1 to add any Utility Providers and/or account numbers that were omitted therefrom and to request that the relief requested herein apply equally to all such entities and accounts. Furthermore, the relief requested

27 herein shall apply to all of Debtor's accounts with every Utility Provider listed in Exhibit 1 regardless of whether each such account is contained in Exhibit 1. In addition, Debtor reserves the right to argue that any of the entities now or

28 hereafter listed in Exhibit 1 are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

**E.      Debtor's Motion for Interim and Final Orders Authorizing Debtor to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business.**

89.      In the *Debtor's Motion for Interim and Final Orders Authorizing Debtor to Honor and Continue Certain Customer Programs and Customers Obligations in the Ordinary Course of Business* ("**Customer Programs Motion**"), Debtor requests that this Court enter interim and final orders, substantially in the form attached thereto as Exhibit 1 and 2: (1) authorizing Debtor to honor its prepetition Customer Obligations in the ordinary course of business; (2) authorizing Debtor to continue its Customer Programs in the ordinary course of business; (3) authorizing all applicable banks and other financial institutions, when requested by Debtor, to receive, process, honor, and pay any and all checks and transfers related to the foregoing, whether presented prior to or after the Petition Date in accordance with the stated policies with regard thereto, provided sufficient funds exist in Debtor's accounts to cover such payment; and (4) for such other and further relief as is just and proper.

90.      There are several different ways for individuals to purchase tickets to ride the Monorail, including from vending machines at the stations and through online travel agent (OTA) sites such as Expedia and Vegas.com, various travel agents, tour and travel companies and other travel resellers, discount consumer sites such as Groupon, through integrations with convention badges on contracted convention websites, and android phone users are able to purchase directly in the Google Pay platform and store in their Google Pay wallet.

91.      Electronic tickets are valid for 365 days from purchase as long as they are not validated at a Monorail faregate.  Debtor has been contacted for refunds by customers who either purchased tickets prior to the closure of the system on March 18 for a planned trip, or purchased a ticket within the initial closure period with the expectation of using their ticket upon their next visit to Las Vegas with the assumption that the Monorail would recommence operations by the time they arrived.

92.      In the ordinary course of business, Debtor honored tickets for 365 days from purchase and, if requested, provided refunds if the System was closed ("**Customer Programs**").

93.     The amount of these refunds range from approximately $20 up to $200 or more, based on the quantity and length of timeframe of the passes purchased.  Debtor estimates that through November 30, 2020, the amount of such refunds will not exceed $15,000.

94.     Debtor believes that its ability to continue to offer and honor the Customer Programs is essential to the satisfaction of its customers and the maintenance of customer relationships.

95.     To effectuate a smooth transition into Chapter 11, Debtor submits that it must maintain customer loyalty and goodwill by maintaining and honoring the Customer Programs. Debtor implemented the Customer Programs in the ordinary course of business prior to the Petition Date as a means by which to maintain positive, productive, and profitable relationships with its customers, encourage new purchases, enhance customer satisfaction, and ensure that Debtor remain competitive in its industry.

96.     The Customer Programs are designed and implemented to encourage Debtor's customers to increase its purchasing frequency and volume, resulting in larger net revenues for Debtor and, in return, greater satisfaction for the customers.

97.     Accordingly, Debtor's ability to honor the Customer Programs in the ordinary course of business is necessary to retain its customer base and reputation within its industry.  On account of the Customer Programs, Debtor may owe certain obligations to its customers, like refunds, arising both before and after the Petition Date.

98.     The success and viability of Debtor's business, and ultimately Debtor's ability to maximize the value of the Debtor's estate, are dependent upon the patronage and loyalty of its customers. In this regard, the Customer Programs are essential, and any delay in honoring Customer Obligations will severely and irreparably impair customer relations, thereby harming Debtor's efforts to maximize value for all interested parties.

99.     Debtor seeks authority to continue, in its discretion, to offer and honor its obligations in connection with the Customer Programs, including the payments related to requested refunds ("**Customer Obligations**").

100.    Debtor's ability to immediately honor Customer Obligations is necessary to retain and maintain a substantial and integral part of Debtor's business operations and customer base. Indeed, Debtor believes that, without the requested relief, its customers will lose confidence in Debtor and may cease continued relationships.  In addition, honoring the Customer Obligations is consistent with maintaining the System as a going-concern as the Debtor pursues the Sale. Allowing Debtor to honor its prepetition Customer Obligations is especially appropriate where doing so is consistent with the "two recognized policies" of Chapter 11 of the Bankruptcy Code— preserving going concern value and maximizing the value of property available to satisfy creditors.

101.    For the foregoing reasons, honoring the prepetition Customer Obligations will benefit Debtor's estate and its creditors by allowing Debtor's business operations to continue without interruption.

102.    Debtor has determined, in the exercise of its sound business judgment, that honoring the Customer Obligations and continuing the Customer Programs are not only essential to the eventual resumption of operations, but also necessary to ensure that the value of Debtor on a going-concern basis is preserved through the pendency of the Sale.

103.    Any loss of customers caused by failure to honor the Customer Obligations under the Customer Programs will damage Debtor's core business to a far greater extent than the costs associated with honoring such prepetition Customer Obligations and Customer Programs.

104.    Debtor submits that it has sufficient availability of funds to pay the amounts described herein in the ordinary course of business.  Also, under Debtor's existing cash management systems, Debtor represents that it can readily identify requests relating to an authorized payment made pursuant to its Customer Obligations described in this Motion. Accordingly, Debtor requests authorization to issue replacement checks, submit replacement fund transfer requests, or provide other means to the extent necessary to pay all outstanding prepetition Customer Obligations.  Debtor's banks and financial institutions shall be entitled to rely on the representations of Debtor as to which refunds are issued or authorized to be paid pursuant to the order.

105.    In view of the urgency of the relief requested in the Customer Programs Motion and the risk to Debtor's limited operations if Debtor cannot pay its Customer Obligations, a fourteen-day stay of the relief sought herein is impractical.

106.    If the outstanding Customer Obligations are not immediately satisfied, Debtor will experience immediate and irreparable harm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 7th day of September, 2020.

By: */s/ Curtis L. Myles, III*
    CURTIS L. MYLES, III