1   GARMAN TURNER GORDON LLP
    GERALD M. GORDON
2   Nevada Bar No. 229
    E-mail: ggordon@gtgt.legal
3   MARK M. WEISENMILLER
    Nevada Bar No. 12128
4   E-mail: mweisenmiller@gtg.legal
    JONATHAN A. RICH
5   Nevada Bar No. 15312
    E-mail: jrich@gtg.legal
6
    7251 Amigo Street, Suite 210
7   Las Vegas, Nevada 89119
    Telephone (725) 777-3000
8   Facsimile (725) 777-3112
9   *[Proposed] Attorneys for Debtor*

10              **UNITED STATES BANKRUPTCY COURT**

11               **FOR THE DISTRICT OF NEVADA**

12  | In re: | Case No.: BK-S-20-14451 |
    | | Chapter 11 |
13  | LAS VEGAS MONORAIL COMPANY, a | |
    | Nevada non-profit company | |
14  | | |
    |        Debtor. | |
15  | | Date:  **OST REQUESTED** |
    | | Time:  **OST REQUESTED** |

16
    **DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 363, 365, 503(b), AND 507(a)(2)**
17  **OF THE BANKRUPTCY CODE:  (I) APPROVING BIDDING PROCEDURES FOR THE**
    **SALE OF SUBSTANTIALLY ALL ASSETS OF DEBTOR, SCHEDULING AN AUCTION**
18  **AND SALE HEARING, AND APPROVING THE FORM AND MANNER OF NOTICE**
    **THEREOF; (II) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS,**
19  **CLAIMS, INTERESTS, AND ENCUMBRANCES, (III) APPROVING THE ASSUMPTION**
    **AND ASSIGNMENT OF CERTAIN RELATED EXECUTORY CONTRACTS;**
20  **(IV) WAIVING THE REQUIREMENTS OF BANKRUPTCY RULES 6004(h) AND**
    **6006(d), AND (IV) GRANTING RELATED RELIEF**
21

22

23

24

25

26

27

28

4840-7221-3703, v. 3

1

## TABLE OF CONTENTS

**I.      JURISDICTION AND VENUE** ........................................................................... **2**

**II.     PERTINENT FACTS** ........................................................................................ **3**

A.    Debtor's Business and Assets............................................................................3
B.    Debtor's Prepetition Capital Structure..............................................................3
C.    Debtor's Reasons for the Proposed Sale. .........................................................6
D.    Debtor's Reasons for the Proposed Sale on an Accelerated Timeline................8

**III.    SUMMARY OF TERMS UNDER LR 6004(B)** ............................................ **9**

**IV.     RELIEF REQUESTED** .................................................................................. **15**

**V.      BASIS FOR RELIEF** ...................................................................................... **17**

A.    The Sale of the Assets is Authorized by Sections 105(a) and 363(b) of the Bankruptcy
Code……................................................................................................................17
B.    The Bidding Procedures Are Appropriate and Will Maximize Value. ...............19
     *1.    The Bidding Procedures are Reasonable and Appropriate and Should be Approved as a
     Sound Exercise of Debtor's Business Judgment.* ............................................19
     *2.    Credit Bidding Should Be Authorized Pursuant to Section 363(k).*...................20
     *3.    The Bidding Protections Should be Approved.* .............................................20
C.    Sales Free and Clear of Liens, Claims, Interests, and Encumbrances Are Authorized and
Appropriate Under Section 363(f) of the Bankruptcy Code. .............................21
D.    The Successful Bidd Will Be a "Good-Faith Purchaser" Under Section 363(m) ...............23
E.    Assumption and Assignment of Contracts..........................................................24
F.    Appointment of a Consumer Privacy Ombudsman is Not Required by Sections 332   AND
363(b)(1) of the Bankruptcy Code. ....................................................................25
G.    Notice of the Bidding Procedures and the Sale Process is Sufficient....................26
H.    The Requirements of Bankruptcy Rule 6003 Have Been Satisfied and Bankruptcy Rule
6004(h) is Properly Waived.................................................................................27

**VI.     CONCLUSION** ................................................................................................. **27**

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Cases**

*Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.)*, 476 F.3d 665 (9th Cir.2007)...........................................................................................................18, 24

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) ............................................................................................................. 19

*Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904 (9th Cir. 1997) ....................................................................................... 23

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-1071 (2d Cir.1983) ....................................................................................................................... 17

*EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993) ........... 25

*Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252 (3d Cir.2000) ....................................................................................... 22

*Food Barn Stores, Inc.*, 101 B.R. 558 (8th Cir.1997)............................................................................................... 19

*Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991) ................................................................................................ 18

*In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989) .............................................................................. 21

*In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir.1986) ................................................................................................18, 23

*In re ANC Rental Corp., Inc.*, 277 B.R. 226 (Bankr. D.Del. 2002) .......................................................................... 24

*In re Bygaph, Inc.*, 56 B.R. 596 (Bankr. S.D.N.Y. 1986) .............................................................................. 25

*In re Chi-Feng Huang*, 23 B.R. 798 (B.A.P. 9th Cir.1982)............................................................................... 18

*In re Hupp Int'l Indus., Inc.*, 140 B.R. 191 (Bankr. N.D.Ohio 1992) ...................................................................... 21

*In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992) ...................................................................................passim

*In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) .............................................................................. 23

*In re Kellstrom Indus., Inc.*, 282 B.R. 787 (Bankr. D.Del. 2002) .......................................................................... 22

*In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir.1996) ................................................................................................ 22

*In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D.Del. 1999) ...................................................................................... 24

*In re New England Fish Co.*, 19 B.R. 323 (Bankr. W.D.Wash. 1982)....................................................................... 22

*In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir.1999) ................................................................................................ 19

*In re Sasson Jeans, Inc.*, 90 B.R. 608 (S.D.N.Y. 1988) ........................................................................................ 23

*In re Trans World Airlines, Inc.*,
  No. 01-00056, 2001 WL 1820326 (Bankr. D.Del. 2001) ............................................. 19
*In the Matter of Andy Frain Servs., Inc.*,
  798 F.2d 1113 (7th Cir.1986) ...................................................................................... 23
*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  837 F.2d 89 (2d Cir.1988) ...................................................................................... 18, 22
*Mushroom Transp. Co., Inc.*,
  382 F.3d 325 (3d Cir.2004) ......................................................................................... 19
*Myers v. Martin (In re Martin)*,
  91 F.3d 389 (3d Cir.1996) ........................................................................................... 18
*Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*,
  195 B.R. 716 (Bankr. N.D.Ind. 1996) ......................................................................... 22
*Pacific Shores Development, LLC v. At Home Corp. (In re At Home Corp.)*,
  292 B.R. 195 (N.D.Cal. 2003) ..................................................................................... 18
*Stephens Indus., Inc. v. McClung*,
  789 F.2d 386 (6th Cir.1986) ........................................................................................ 18
*Summit Land Co. v. Allen (In re Summit Land Co.)*,
  13 B.R. 310 (Bankr. D.Utah 1981) ............................................................................. 24
*WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*,
  189 B.R. 97 (Bankr E.D.Va. 1995) .............................................................................. 22

**Statutes**

11 U.S.C. § 363(k) ........................................................................................................ 20
11 U.S.C. § 363(b)(1) ...............................................................................17, 18, 24, 25
28 U.S.C. §§ 157 ............................................................................................................. 2
11 U.S.C. § 365(f)(1) ................................................................................................... 23
11 U.S.C. § 365(f)(2) ................................................................................................... 25
11 U.S.C. § 365(f)(3) ................................................................................................... 23

4840-7221-3703, v. 3

Las Vegas Monorail Company, debtor and debtor-in-possession ("**Debtor**"), by and through its undersigned proposed counsel, hereby submits this motion pursuant to Sections[1] 105(a), 363, 365, 503(b), and 507(a)(2) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002, 6004, and 9014 (this "**Motion**" or "**Bidding Procedure and Sale Motion**") for:

      1)     Entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "**Bidding Procedures Order**"), approving bidding procedures for the sale of substantially all of Debtor's assets (the "**Sale Assets**"), setting an auction and sale hearing date (the "**Sale Hearing**"), and approving notices and other relief related to the foregoing; and

      2)     Following the Sale Hearing, entry of one or more orders, substantially in the form to be filed by Debtor prior to the Sale Hearing (the "**Sale Order(s)**"), authorizing and approving the sale of such Sale Assets free and clear of liens (statutory or otherwise), claims, interests, and encumbrances of every kind and nature with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds (the "**Sale**") to the Las Vegas Convention and Visitors Authority ("**LVCVA**" or "**Stalking Horse Bidder**") or any other qualified bidder who presents a higher and better offer to purchase the Sale Assets (the " **Successful Bidder**"), on substantially similar terms as those set forth in the that certain *Asset Purchase and Sale Agreement*, dated September 2, 2020, be and between Debtor and the Stalking Horse Bidder ("**Stalking Horse Agreement**")[2], or as may be further modified by the Successful Bidder, the assumption and assignment of related executory contracts and unexpired leases, waiving of the requirements of Bankruptcy Rules 6004(h) and 6006(d), and granting related relief. A true and correct copy of the Stalking Horse Agreement is attached to the Myles Declaration as Exhibit 1.

This Motion is made and based upon the following Memorandum of Points and Authorities, the accompanying *Declaration of Curtis Myles in Support of Motion to Sale Pursuant to*

---

[1] Unless otherwise stated, all references to "Chapter" and "Section" herein shall be to title 11 of the U.S. Code (the "Bankruptcy Code"); all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to "Local Rule" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

[2] Capitalized undefined terms used herein shall be ascribed the definitions in the Stalking Horse Agreement and Redemption Agreement.

*Sections105(a), 363, 365, 503(b), and 507(a)(2) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002, 6004, and 9014* filed on September 7, 2020 (the "**Myles Declaration**"), the *Omnibus Declaration of Curtis Myles in Support of First Day Motions* filed on September 7, 2020 (the "**First Day Declaration**"), the papers and pleadings on file herein, judicial notice of which is hereby respectfully requested, and the argument of counsel entertained by the Court at the time of the hearings on the Motion.

## I.    JURISDICTION AND VENUE

1.      On September 7, 2020 ("**Petition Date**"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases ("**Bankruptcy Case**").

2.      Debtor continues to operate its business and manage and preserve its property as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committees have been appointed in the Chapter 11 Case.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1134 and Local Rule 1001(b)(1).  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9014.2, Debtor consents to entry of final order(s) or judgment(s) by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the U.S. Constitution.

4.      Venue of the Debtor's Chapter 11 case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory basis for the relief sought herein arises from Sections 105(a), 363, 365, 503(b), and 507(a)(2) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002, 6004, and 9014.

## II.    PERTINENT FACTS

### A.    Debtor's Business and Assets.

6.      Debtor is a Nevada non-profit corporation that owns the Las Vegas Monorail, an approximately 3.9 mile monorail mass transit system located on the east side of Las Vegas Boulevard

in Clark County, Nevada, including two parallel elevated tracks, seven elevated stations, an operations, maintenance and storage facility (the "**OMSF**"), nine automated four car trains, and related equipment, facilities, and improvements (collectively, the "**System**").    See Myles Declaration, ¶ 5.

7.    The System is operated on land owned by Clark County, Nevada (the "**County**") pursuant to rights of way and the Franchise Agreement (together with amendments thereto, the "**Franchise Agreement**") with the County, and on privately owned land pursuant to a ground leases and grants of easement.  See id., ¶ 6.

**B.    Debtor's Prepetition Capital Structure.**

8.    *Prepetition Indenture and Loan.*  Pursuant to the *Indenture of Trust*, dated October 1, 2019 (the "**Indenture**"), by and between the Public Finance Authority, a unit of government and a body corporate and politic, established and existing under and by virtue of the laws of the State of Wisconsin, including Sections 66.0301, 66.0303 and 66.0304 of the State of Wisconsin Statutes, as from time to time amended and supplemented (the "**Authority**"), and UMB Bank, N.A., a national banking association organized and existing under the laws of the United States of America, as trustee ("**UMB**"), the Authority issued the Public Finance Authority Revenue Bonds (Las Vegas Monorail) Series 2019A (the "**2019A Bonds**") and Public Finance Authority Revenue Bonds (Las Vegas Monorail) Series 2019B (the "**2019B Bonds**" and, collectively with the 2019A Bonds, the "**Bonds**"), to make a loan (the "**Conduit Loan**") to Debtor to finance (a) finance the cost of the acquisition, construction, improving, and/or equipping of a transportation project (the "Sands Station"), (b) refinance certain short-term indebtedness incurred by Debtor in the aggregate principal amount of $13,750,000 owed pursuant to that certain Loan Agreement dated as of July 12, 2019 (the "**Bridge Loan**"), to refinance certain of the costs of the acquisition, construction, improving and/or equipping the existing approximately 3.9 mile, 7-station, 9-train monorail along the east side of the Las Vegas Strip owned and operated by the Borrower ("**Existing Monorail**"), and (c) and other costs required in connection therewith.  The Debtor as a non-profit corporation issued the Bonds are tax-free bonds.  See id., ¶ 7.

9.    *The Conduit Loan*.  The Conduit Loan was in the initial principal amount of $20,500,000.00, of which $20,400,000.00 was to accrue interest at the rate of interest applicable to the 2019A Bonds from the Date of Delivery, $100,000.00 shall accrue interest at the rate of interest applicable to the 2019B Bonds from the Date of Delivery, and an amount of up to $13,115,000.00, to the extent drawn down on the 2019B Bonds Final Draw Down Date, shall accrue interest at the rate of interest applicable to the 2019B Bonds from the 2019B Bonds draws. See Myles Declaration, ¶ 8.

10.    *Bondholder*. The sole purchaser of the Bonds was Preston Hollow Capital, LLC ("**PHC**") which as of the Petition Date remains the sole holder of the Bonds.  See id., ¶ 9.

11.    *Additional Financing Documents*.  In addition to the Indenture, the following financing documents were executed;

    a.    The Authority and Debtor entered into the *Financing Agreement*, dated October 1, 2019 (the "**Bonds Financing Agreement**"), specifying the terms and conditions of the Conduit Loan;

    b.    The Debtor and the Authority entered into the *Tax Agreement*, dated October 10, 20129 (the "**Tax Agreement**") regarding the tax-free treatment for the Bonds; and

    c.    The Debtor, Trustee, PHC and Wells Fargo Securities, LLC, as the Underwriter, entered into the *Agreement to Advance* dated as of October 1, 2019 (the "**Agreement to Advance**"), regarding the advancement of the Conduit Loan.

True and correct copies of the Indenture, Bonds Financing Agreement, Tax Agreement and Agreement to Advance are attached as Exhibit 2, 3, 4, and 5 to the Myles Declaration.  See id., ¶¶ 10-11.

12.    *Prepetition Security Interests and Prepetition Collateral*.  Debtor, as grantor, and UMB executed the following security documents for the Conduit Loan;

    a.    *Security Agreement* dated October 10, 2019 (the "**Bonds Security Agreement"),** to secure the payment and performance of the Secured Obligations (as defined in the Prepetition Security Agreement) in which Debtor unconditionally granted to Secured Party for the benefit of the Security Party and PHC, a continuing security

interest in all property of Debtor, whether real or personal, tangible or intangible, now owned or hereafter acquired or arising and wherever located, including, without limitation, all of Debtor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located, including, but not limited to, all of Debtor's real or personal property, equipment, inventory, money, accounts, Accounts and Deposit accounts (as those terms are defined in the Prepetition Security Agreement).

b.  *UCC -1 Financing Statement* filed with the Nevada Secretary of State on October 10, 2019 ("**Bonds UCC-1 Financing Statement**");

c.  *Collateral Assignment of Easements* entered into as of October 10, 2019 (the "**Easements Assignment**") assigning the easements scheduled therein as collateral for the Conduit Loan; and

d.  *Collateral Assignment of Contract* entered into as of October 10, 2019, assigning for security purposes the Franchise Agreement to UMB (the "**Contract Assignment**" and together with the Indenture, Financing Agreement, Tax Agreement, Agreement to Advance, Bonds Security Agreement, Bonds, UCC-1 Financing Statement, and Easement Assignment, the "**Bonds Loan Documents**"), for security purposes the Franchise Agreement, dated December 2, 1998.

True and correct copies of the Bonds Loan Documents are attached as Exhibit 6, 7, 8, and 9 to the Myles Declaration. See Myles Declaration, ¶¶ 12-13.

13.    *Prepetition Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Conduit Loan was $20,500,000.  See id., ¶ 14.

14.    *EIDL Loan*.  Pursuant to that certain *Loan Authorization and Agreement,* dated June 15, 2020 ("**EIDL Loan Agreement**")*,* the U.S. Small Business Administration ("**SBA**") authorized an Economic Injury Disaster Loan to Debtor in the amount of $150,000 ("**EIDL Loan**").  See id., ¶ 15.

15. *EIDL Note*. In return for the EIDL Loan, Debtor promised to pay to the order of the SBA $150,000, interest on the unpaid principal balance and all other amounts required under the *Note*, dated June 15, 2020 ("**EIDL Note**"). See Myles Declaration, ¶ 16.

16. *EIDL Security Agreement*. Debtor also executed a *Security Agreement*, dated June 15, 2020 ("**EIDL Security Agreement**") under which Debtor granted the SBA a security interest in the all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The EIDL Security Interest does not extend to Debtor's bank accounts. See id., ¶ 17.

17. *EIDL UCC -1 Financing Statement*. The SBA filed with the Nevada Secretary of State on July 2, 2020 a *UCC-1 Financing Statement* ("**EIDL UCC-1 Financing Statement**," and together with the EIDL Loan Agreement, EIDL Note, and EIDL Security Agreement, the "**EIDL Loan Documents**"). True and correct copies of the EIDL Loan Documents are attached to the Myles Declaration as Exhibits 10, 11, 12 and 13. See id., ¶ 18.

**C.    Debtor's Reasons for the Proposed Sale.**

18. In October 2019, based on the strength of the performance of the System at the time and on projections of System performance, the Debtor secured the Conduit Loan. See id., ¶ 19.

19. As part of the cash flow projections supporting the Conduit Loan, the Debtor demonstrated its ability to meet annual maintenance and operational expenses, as well as longer term capital expense. The long-term needs included replacement of the System's radio communication system (approximately $2,500,000), fare collection system (approximately $6,000,000), and station elevators and escalators (from $7,000,000 to $10,000,000), among other replacements. The Debtor had also begun the process of determining the financing structure of the replacement of Monorail trains, expected to begin replacement in 2034 at an anticipated cost of approximately $190,000,000. See id., ¶ 20.

20.    Debtor began 2020 with increases in ridership and revenue, with ticket sales through the first two months of the year up over 7%. Through March 18, 2020, when System operations were suspended, the Debtor saw a net operating gain of nearly $1.6 million, a 48% increase over 2019. See Myles Declaration, ¶ 21.

21.    Although the first reported COVID-19 case in Nevada occurred on February 26, 2020, and as information on the spread of the virus increased on a daily basis, the strong system performance continued into the first two weeks of March 2020 with tickets sales during just the first two weeks of March 2020 nearly equaling total sales for all of March 2019. However, as reports of the rate of infections and fatalities grew, state and local governments began to react to what was clearly becoming a national and global medical emergency. The tourism and convention market in Las Vegas suddenly began a steep decline. As reported cases grew in Nevada, the State and local governments issued a number of orders closing businesses and restricting gatherings, including resort hotels, convention facilities, shopping, dining, showroom and concert venues. Nationally, federal authorities instituted a number of travel restrictions, limiting domestic and international flights. Collectively, these myriad governmental orders and restrictions within mere days worked to severely dampen visitation to Las Vegas. See id., ¶ 22.

22.    On March 18, 2020, after Governor Sisolak issued orders to close all non-essential businesses, all hotels, restaurants, showrooms, shopping and entertainment venues along the Las Vegas Strip, including those connected to the System, shut down. The Governor's orders also caused the cancellation of nearly all conventions through January 2021; and delayed openings of other large tourism-based projects like the MSG Sphere Entertainment venue and the 3500 room Resorts World Las Vegas Hotel. With the System's normal ridership demographic consisting of well over 95% visitors, and visitation reduced to nearly zero, the Debtor made the obvious decision to close the system on March 18, 2020, lay off 93% of its staff, reduce the compensation of remaining staff by up to 30%, eliminate fees paid to its board of directors, and cut maintenance and operational expenses to the bare minimum needed to maintain the value and operability of the system. With no realistic projection on when visitation and other Las Vegas Strip area business will return to pre-pandemic

levels, the Debtor was forced to rely on cash reserves moving forward for the foreseeable future. See Myles Declaration, ¶ 23.

**D.    Debtor's Reasons for the Proposed Sale on an Accelerated Timeline.**

23.    On March 31, 2020, the Debtor had $1.12 million in unrestricted cash with which to maintain the system in closed status.  By August 31, 2020 nearly all of the unrestricted cash had been exhausted.  See id., ¶ 24.

24.    An accelerated sale process is required for several reasons.  The Debtor faces liquidity constraints that necessitate an accelerated sale process.  Prior to the Petition Date the Debtor was able to obtain the Stalking Horse Deposit from the LVCVA which has allowed the Debtor to fund this Chapter 11 Case and minimal operations through November 30, 2020.  Without the Sale closing prior to November 30, 2020, and without another infusion of significant cash amounts, the Debtor will no longer have the wherewithal to continue its limited operations and maintain the value of its assets.  See id., ¶ 25.

25.    Even with the eventual resumption of revenue operations, without a return to pre-COVID-19 economic activity in Las Vegas, including domestic and international air travel, dining and shopping offerings, large scale conventions, concerts, sporting and other special events, the Debtor cannot achieve an operating profit.  See id., ¶ 26.

26.    Moreover, by 2034, Debtor's needs for the replacement and repair of its capital assets ("**Capital Expenditure**" or "**CapEx**"), including replacement of the nine automated four-car trains, tracks, and related equipment will exceed $250,000,000.  See id., ¶ 27.

27.    Grants of easements for rights-of-way and stations by Harrah's and Imperial Palace to Debtor automatically terminate if the System is owned or operated by a for-profit entity.  See id., ¶ 28

28.    The ownership of the Assets by an entity other than a governmental entity or a non-profit entity will eliminate the tax-free nature of the Bonds and require the immediate refinance of the Bonds which, as provided for in the Bond Loan Documents, will be with a redemption price significantly higher than the outstanding principal amount of the Bonds plus accrued interest.  The Sale to the LVCVA avoids these consequences.  See id., ¶ 29.

29.     Given that the Debtor will not generate any revenue for the foreseeable future, the lack of fair market value of the Monorail over and above the Conduit Loan and EIDL Loan, and the requirements under Section 364 of the Bankruptcy Code for obtaining post-Petition Date financing, the Debtor is not able to obtain financing during the Chapter 11 Case and operate past November 30, 2020.  Debtor did receive an offer to provide debtor-in-possession financing in an unstated amount to sustain operations during a Chapter 11 Case as a "priming loan" ahead of the Conduit Loan and EIDL Loan.  PHC dismissed this out-of-hand.  Given the inability to provide adequate protection as I understand the concept, any form of a debtor-in-possession loan is not feasible.  See Myles Declaration, ¶ 30.

30.     Given Debtor's current financial condition, the existing pre-petition and post-petition marketing of Debtor's business, the implications if sold to a for-profit entity, and the fact that a sale on the terms set forth in the Stalking Horse Agreement will result in satisfaction of substantially all of Debtor's pre-petition liabilities and allow for the resumption of the Monorail revenue operations when feasible, Debtor believes that the terms of the Stalking Horse Agreement and timeline are both reasonable and necessary under the circumstances of the Chapter 11 Case and in the best interests Debtor's estate and creditors.  See id., ¶ 31.

31.     Accordingly, Debtor respectfully submits that the proposed Sale procedure and timeline is in the best interests of its estate and creditors and should be approved.  See id., ¶ 32.

### III.     SUMMARY OF TERMS UNDER LR 6004(B)

Consistent with Local Rule 6004(b), Debtor discloses the following information regarding the Stalking Horse Agreement and the Sale.  All such disclosures are qualified in their entirety by the Stalking Horse Agreement and related documents between Debtor and the LVCVA (the "**Sale Documents**"), the *Agreement to Alternate Redemption Price for 2019A and 2019B Bonds* (the "**Redemption Agreement**") by and between the LVCVA, PHC and UMB and/or any purchase agreement negotiated with a Successful Bidder for the Sale (the "**Final APA**").

(i)     *Stalking Horse Agreement – LR 6004(b)(1)*.  A true and correct copy of the Stalking Horse Agreement is attached as Exhibit 1 to the Myles Declaration.

(ii)    *Liens on Sale Assets – LR 6004(b)(2)*.  UMB and SBA have perfected liens against the Sale Assets with the Conduit Loan having priority over the EIDL Loan.

(iii)    *Proposed Form of Sale Order – LR 6004(b)(3)*.  A copy of the proposed form of Sale Order is attached hereto as **Exhibit 2**.

(iv)    *Consumer Privacy Ombudsman – LR 6004(b)(4)*.  Debtor is not requesting the appointment of a consumer privacy ombudsman under Section 332 for the reasons set forth below.

(v)    *Material Terms – LR 6004(b)(5) and (b)(6)*:

(a)    *Purchase Price*.  Stalking Horse Bidder shall pay to Debtor the sum of Twenty-Four Million One Hundred and Forty-Six Thousand Ninety-Four Dollars ($24,146,094.00) ("**Purchase Price**") as consideration for the Sale Assets. This includes the non-refundable earnest money deposit of One Million Nine Hundred Forty-Six Thousand Seven Hundred Thirty Dollars ($1,946,730.00) (the "**Stalking Horse Deposit**"), payment of the redemption price of Twenty Million Two Hundred and Seven Thousand and Fifty-Seven Dollars ($20,207,057.00) for the Conduit Loan, One Hundred Fifty Thousand Dollars ($150,000.00) for the EIDL Loan and One Million Eight Hundred Forty-Two Thousand Three Hundred Seven Dollars ($1,842,307.00) of assumed trade and contractual liabilities of Debtor (the "**Assumed Liabilities**"). In addition, the Stalking Horse Bidder shall pay all Cure Amounts for Assumed Executory Contracts.  See Stalking Horse Agreement, §§ 4.2 and 5.2.

(b)    *Redemption Agreement.*  Pursuant to the Redemption Agreement executed by and between LVCVA, PHC and UMB, PHC and UMB have agreed to accept in full payment of the Conduit Loan the sum of $22,035,000 plus interest accrued to the date of redemption of the Bonds pursuant to the Sale (the "**Alternate Redemption Price**"), which is less than the redemption price calculated pursuant to Section 4.01(a) and 4.01(b) of the Indenture.  A true and correct copy of the Redemption Agreement is attached as **Exhibit 14** to the Myles Declaration.

(c)    *Reserve Accounts*.  In accordance with the Section 2(c)(1) of the Redemption Agreement, on the Closing Date without further order of the Bankruptcy Court, UMB and PHC shall apply up to Two Million Five Hundred Thousand Dollars ($2,500,000.00) in payment of the Bonds from amounts held under the Indenture or Financing Agreement on deposit in the Capital Expenditure Reserve Fund, Supplemental Reserve Fund, Operating Reserve Fund, Debt Service Fund and the Reserve Fund, or any other reserve held by UMB (collectively, the "**2019 Trustee Held Funds**").  UMB and PHC shall be entitled to withdraw from the 2019 Trustee Held Funds an amount not to exceed Fifty Thousand Dollars ($50,000.00) for legal fees incurred in connection with the Bankruptcy Case with the balance of the 2019 Trustee Held Funds after payment of the $2,500,000 and the legal fees not to exceed $50,000 shall be transferred to Debtor free and clear of any liens or claims of UMB.

(d) *Transferred Assets*.  As set forth in the Stalking Horse Agreement, Sale Assets include the following:

(i) the System;

(ii) all equipment, machinery, parts, tools, appliances, inventory, supplies, furniture, trade fixtures, and other personal property assets (including ticket vending machines, ticket stock, turnstiles, and signs and signage) and motor vehicles and maintenance vehicles used in connection with the ownership or operation of the System (collectively, the "**Personal Property**");

(iii) Executory Contracts assumed by Debtor and assigned to the Stalking Horse Bidder pursuant to Section 5.2 of the Stalking Horse Agreement and set forth on Schedule 5.2 of the Stalking Horse Agreement which includes the OMSF Lease (collectively, the "**Assumed Contracts**"); provided, however, that if any Assumed Contract is recharacterized by a Final Order to not be an Executory Contract, then the property that is subject to such Assumed Contract and all of Debtor's rights thereunder shall be sold free and clear of any interest therein as part of the Sale Assets;

(iv) the name "Las Vegas Monorail" and any variation thereof and all right, title and interest in and to any and all copyrights, trademarks, trade names, service marks, patents, trade secrets, displays, symbols, color arrangements, System methods, designs and logos with respect thereto and/or relating to and/or used by Debtor in the ownership, use and/or operation of the System and/or the Sale Assets, and other names, words or devices and related applications and registrations;

(v) all plans and specifications, vendor lists, historical ridership data and information, accounting books and records, financial statements, computer files and records, reports and studies, marketing, advertising, and sales plans, information and studies, and other similar reports used in the ownership or operation of the System by Debtor and that belong to Debtor;

(vi) all manufacturers' or other assignable warranties applicable to any other items included in the Sale Assets and all assignable permits, licenses, approvals and other authorizations issued by any governmental agency or entity in connection with the System, in each case to the extent assignable;

(vii) all computer hardware used by Debtor in the operation of the System or the Sale Assets and computer software owned or licensed by Debtor and used in connection with the System or the Sale Assets, to the extent transferable (and any transfer fees to be paid by Stalking Horse Bidder), including, without limitation, if possessed by Debtor, source codes and data, whether on tape, disc or other computerized format, and all related user manuals, computer records, service codes, programs, stored materials and databases, including, without limitation, all access codes and instructions needed to obtain access to and to utilize the information contained on such computer records, including, without limitation, with respect to e-Ticketing, mobile tickets, and smart phone applications;

(viii) all of Debtor's insurance policies or contracts, except for any directors and officers insurance policies held by Debtor, which shall be assigned to Stalking Horse Bidder at Closing, to the extent assignable, and any interests, claims and choses of action in any past or current insurance policy or Contract, including all rights to contribution and insurance proceeds in respect of Sale Assets;

(ix)   Debtor's right, title, and interest in that certain Clark County Monorail Franchise Agreement dated as of December 2, 1998, as amended or modified on October 20, 1999, on October 7, 2003, on November 1, 2005, on December 6, 2006, on December 3, 2008, on May 3, 2016, on November 1, 2016, on November 21, 2017, and on December 19, 2018, and as it may in the future be amended, supplemented, modified or extended from time to time, between Debtor, as successor to MGM Grand-Bally's Monorail LLC, a Nevada limited liability company, and Clark County, Nevada, granting Debtor the right to operate the Monorail in the public right of way, or any successor agreement thereto (collectively, the "**Franchise Agreement**"), including, without limitation:

> (i)   the "Removal Costs Fund" established pursuant to the terms of that certain Escrow Agreement, dated as of September 1, 2000, as amended by the First Amendment to Escrow Agreement, dated May 3, 2016, and the Second Amendment to Escrow Agreement, dated November 21, 2017, and as further amended from time to time, each by and among Clark County, the Borrower and Wells Fargo Bank, National Association, as escrow agent and Debtor's right, title and interest in and to said Escrow Agreement and the escrow thereunder; and

> (ii)   the "County Support Amount," which means any Remaining Room Tax made available by the County to Debtor pursuant to the "County Resolution," which means the resolution of the County relating to the West Extension of the Monorail, which includes the Sands Station, adopted by the County Board of Commissioners on November 21, 2017, as such resolution may be amended or supplemented from time-to-time;

(x)   Debtor's rights, title and interest in and to leases and all Easements (as defined in Section 7.1(g)(iv) of the Stalking Horse Agreement and set forth in Disclosure Schedule to the Stalking Horse Agreement; and

(xi)   Such other assets of Debtor as may be necessary to operate the System after the Closing Date substantially as previously operated by Debtor or material to the operation of the System as of the Effective Date, other than those Excluded Assets expressly set forth in Section 2.2 (a) – (i) of the Stalking Horse Agreement.  *See* Stalking Horse Agreement, § 2.1(a)-(k).

(e)   *Excluded Assets and Liabilities*.  The assets that constitute "Excluded Assets" are all of Debtor's assets other than the Sale Assets, including, without limitation:

(i) the consideration delivered to Debtor pursuant to the Stalking Horse Agreement, and all of Debtor's rights and interests arising under or in connection with the Stalking Horse Agreement;

(ii)  all cash of Debtor whether on hand, in accounts, on deposit with third parties, or otherwise except the Removal Cost Funds and County Support Amount under the Franchise Agreement and the 2019 Trustee Held Funds as provided for in the Redemption Agreement;

(iii)  all formation and organization documents, minute books, stock record books and all other documents relating to the legal existence of Debtor, and all income tax returns and records, and nontransferable licenses, permits, approvals and other authorizations; provided, however, that copies of such corporate and tax records and nontransferable licenses, permits, approvals and other authorizations shall be provided to Stalking Horse Bidder at the Closing at the request of Stalking Horse Bidder, to the extent such records are not privileged;

(iv)  all of Debtor's interests in any claims (including cross claims or counterclaims) relating to any Taxes (including any deposits, refunds, rebates, credits or other Tax benefits) (other than those that both relate to the Sale Assets and arise after the Closing Date);

(v)  all of Debtor's interest in any directors and officers insurance policies held by Debtor;

(vi)  Debtor's rights and interests as the tenant under a lease agreement for office space located at 3770 Howard Hughes Parkway, Suite 295, Las Vegas, NV 89169 (the "**Office Lease**") or any other offices leases, which Stalking Horse Bidder does not elect to assume and which shall not be binding upon LVCVA after the Closing;

(vii)  Debtor's obligations under that certain Development Agreement dated February 21, 2020 by and between Debtor and LVM Project, LLC, successor to Robert Manzo (the "**Development Agreement**"), which Stalking Horse Bidder does not elect to assume and which shall not be binding upon Stalking Horse Bidder after the Closing; *provided, however,* that if by Final Order the Development Agreement is found not to be an Executory Contract, then the Sale Assets shall be transferred free and clear of any and all claims, rights or interests arising thereunder affecting or related to the Sale Assets or the System;

(viii)  all Chapter 5 Actions and Claims; and

(ix) any claims, causes of action or other rights related to any Retained Liability.

<u>See</u> Stalking Horse Agreement, § 2.2(a)-(i).

(f)  *Free and Clear Sale*.  The Sale Order authorizes and approves the sale of the Sale Assets free and clear of all liens (statutory or otherwise), claims, interests, and encumbrances of every kind and nature with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale Proceeds, and such Sale Proceeds shall be paid to the UMB and the SBA on the Closing Date.  UMB may access and apply the 2019 Trustee Held funds as provided for in the Redemption Agreement and pay over to Debtor any excess funds without further of the Bankruptcy Court.  <u>See</u> Stalking Horse Agreement, § 4.2.

(vi)  ***Insider Status – LR 6004(b)(6)(A)***.  LVCVA is not insider, as defined in 11 U.S.C. § 101(31), and Debtor does not contemplate any sale to an insider.

(vii)    *Agreements with Management or Key Employees – LR 6004(b)(6)(B).*  LVCVA is not obligated to employ or offer employment to any officer, employee, or independent contractor of Debtor.  LVCVA has discussed with management and key employees future employment and may elect to offer employment to any officer, employee, or independent contract of Debtor in its sole and absolute discretion.  <u>See</u> Stalking Horse Agreement, § 8.3.

(viii)    *Releases – LR 6004(b)(6)(C).*  In no event will either Debtor or LVCVA or any of their respective officers, directors, agents, contractors, subcontractors, vendors or employees have any liability to the other party for losses which are incidental, special, consequential, indirect or punitive and neither party shall be liable to the other party to the extent that such other part has received payment of such a claim from another source, and any such payment obligation payable by a party shall be net of any tax benefits obtain by or insurance proceeds available to the other party.  <u>See</u> Stalking Horse Agreement, § 12.1.

(ix)    *Auction – LR 6004(b)(6)(D).*  The Sale Assets are to be sold pursuant to an open Auction if at least one additional Qualified Bids is received by the Debtor.  The Stalking Horse Bidder is deemed a Qualified Bidder and the Stalking Horse Agreement is deemed a Qualified Bid.

(x)    *Deadlines – LR 6004(b)(6)(E).*  The closing of the transactions contemplated by the Stalking Horse Agreement (the "**Closing**") will be conducted electronically, unless the Parties opt for an in-person Closing, on the fifteenth (15th) day following entry of the Sale Order unless the Sale Order shall not be a Final Order, then within two (2) Business Days following the date the Sale Order shall have become a Final Order but in no event later than November 30, 2020 (the "**Outside Date**").

(xi)    *Good Faith Deposit – LR 6004(b)(6)(F).*  Prior to the commencement of the Bankruptcy Case, the LVCVA delivered to Debtor the non-refundable Stalking Horse Deposit in the amount of One Million Nine Hundred Forty-Six Thousand Seven Hundred Thirty Dollars ($1,946,730.00).  The Stalking Horse Deposit was deemed non-refundable and fully-earned by Debtor upon receipt, and shall not be returned to the LVCVA except, as set forth in the Stalking Horse Agreement, if the LVCVA is the Successful Bidder, the Stalking Horse Deposit will be credited against the Purchase Price hereunder at Closing, and in the event that the LVCVA is not the Successful Bidder, the Stalking Horse Deposit will be returned upon the Closing.  <u>See</u> Stalking Horse Agreement, § 4.1.

(xii)    *Closing Conditions.*  The Stalking Horse Agreement contains the following material conditions to closing:

(a)  *Debtor's Closing Deliverables.*  At the Closing, and concurrently with the making of the deliveries by LVCVA of the LVCVA's Closing Deliverables as set forth in Section 6.2 of the Stalking Horse Agreement, Debtor shall deliver, or cause to be delivered, to LVCVA the following (herein referred to collectively as "**Debtor's Closing Deliverables**"):

(i)   the duly executed Bill(s) of Sale;

(ii)   the duly executed Assignment and Assumption Agreement(s);

(iii)  the duly executed Intellectual Property Assignment Agreement; and

(iv)  title certificates to all vehicles included in the Personal Property.

(b) <u>LVCVA Closing Deliverables</u>.  At the Closing, and concurrently with the making of deliveries by Debtor of the Debtor's Closing Deliverables to Stalking Horse Bidder as set forth in Section 6.3, the LVCVA shall deliver, or cause to be delivered, to Debtor each and every payment, agreement, certificate, instrument and other document that is to be executed, delivered and/or performed by Stalking Horse Bidder pursuant hereto including the following (herein referred to collectively as "**Stalking Horse Bidder's Closing Deliverables**"):

(i)  payment of the Purchase Price;

(ii)  the duly executed Bills of Sale;

(iii)  the duly executed Assignment and Assumption Agreement(s); and

(iv)  the duly executed Intellectual Property Assignment Agreements.

## IV.    RELIEF REQUESTED

Debtor requests entry of a Bidding Procedures Order substantially in the form annexed hereto as Exhibit 1:

(a) approving the bidding procedures attached to the Bidding Procedures Order as **Exhibit A** and summarized below ("**Bidding Procedures**");

(b) scheduling the Auction to be held on [_____], 2020 at 12:00 p.m. (prevailing Pacific Time) and granting the Debtor the right, in its sole discretion, to adjourn the Auction;

(c) scheduling the Sale Hearing to consider approval of the Sale, to be held on [_____], 2020 at [_____].m. (prevailing Pacific Time);

(d) approving the form and manner of notice of the Bidding Procedures and the Auction and Sale Hearing ("**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit B**;

(e) authorizing and approving procedures for the assumption and assignment of the Assumed Contracts, including the form and manner of notice of the Debtor's determination of the amount necessary to cure any defaults ("**Cure Costs**") of any Contract which may be assumed and assigned, the deadline for filing any objections thereto, the form of notice of cure amounts and assumption and assignment of such Contracts, substantially in the forms attached to the Bidding Procedures Order as **Exhibit C** ("**Cure Notice**") and **Exhibit D** ("**Assumption and Assignment Notice**");

(f)  approving the overbid protections (the "**Stalking Horse Protections**"), including the Break-Up Fee and Reimbursement Payment which includes in addition to payment of the Stalking Horse Deposit as part of its bid, to pay the Stalking Horse Bidder its reasonable out-of-pocket costs actually incurred in connection with the transaction, in an amount not to exceed Three Hundred Fifty Thousand Dollars ($350,000) (the "**Reimbursement Payment**") and a break-up fee in the amount of two percent (2%) of the Purchase Price (exclusive of the Stalking Horse Deposit) (the "**Break-Up Fee**") by Debtor from the closing on the sale of the Sale Assets to the Successful Bidder;

(g)  authorizing the Debtor to modify the Bidding Procedures in its reasonable business judgment in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional terms and conditions on the sale of the Sale Assets, including, without limitation: (a) extending the deadlines set forth in the Bidding Procedures; (b) adjourning the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) reopening the Auction to consider further Bids or Overbids; (d) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (*e.g.*, the amount of time to make subsequent overbids, whether a non-conforming Bid constitutes a Qualified Bid); (e) canceling the Auction; and (f) rejecting any or all Bids or Qualified Bids, provided that such modifications and/or additional terms and conditions are not materially inconsistent with the provisions of the Bidding Procedures Order;

(h)  authorizing the Debtor to select the highest and/or best Bid(s) for the Sale Assets as one or more Successful Bid(s); and

(i)  granting related relief.

Debtor further requests the entry of one or more Sale Orders following the Auction and Sale Hearing, substantially in the forms to be filed with the Court, which:

(a)  approve the Sale to the Successful Bidder;

(b)  approving the terms of the LVCVA Sale Documents and/or an asset purchase agreement executed by the Successful Bidder(s) in connection with a Sale, in each case free and clear of liens, claims, interests, and encumbrances;

(c)  approving the assumption, assignment, and sale of the Assumed Contracts, if any, to the Successful Bidder(s);

(d)  waiving the requirements of Bankruptcy Rules 6004(h) and 6006(d) with respect to the foregoing; and

(e)  granting related relief.

Debtor further requests approval of the following key dates and deadlines in connection with the foregoing:

(a) **Contract Cure Objection Deadline**: Objections to proposed cure amounts and the potential assumption and assignment of any Assumed Contract to be filed and served no later than _____, 2020 at [_____].m. (prevailing Pacific Time).

(b) **Bid Deadline**:  Bids for the Purchased Assets, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bidding Procedures) to be received by no later than [_____], 2020 at [_____].m. (prevailing Pacific Time) ("**Bid Deadline**").  Debtor may, in its sole discretion, extend the Bid Deadline, subject to LVCVA reserving all of its rights with respect to any defaults that may occur under the LVCVA Sale Documents.

(c) **Auction**: The Auction will be held at either the offices of Garman Turner Gordon, 7251 Amigo Street, Suite 210, Las Vegas, Nevada 89119 on [_____], **2020** at **12:00 p.m.** (prevailing Pacific Time) by video, or such other location as identified by the Debtor after notice to all Qualified Bidders.  Debtor may, in its sole discretion, adjourn the Auction as to the Sale Assets.

(d) **Sale Objection Deadline**: Objections to the Sale will be filed and served no later than [_____], **2020** at **4:00 p.m.** (prevailing Pacific Time).

(e) **Sale Hearing**.  Subject to the Court's schedule, commencement of the Sale Hearing on or before [_____], **2020** at _____ _.m. (prevailing Pacific Time).  The Sale Hearing may be continued from time to time by the Debtors by serving notice the prior to the Sale Hearing or by making an announcement at the Sale Hearing.  No further notice of any such continuance will be required.

## V.    BASIS FOR RELIEF

### A.    The Sale of the Assets is Authorized by Sections 105(a) and 363(b) of the Bankruptcy Code.

Section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 363(b) permits a debtor to use, sell, or lease, estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).

Courts generally require a debtor to demonstrate that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-1071 (2d Cir.1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir.

1    1991) ("[D]ebtor in possession can sell property of the estate outside the ordinary course of business

2    if . . . he has an 'articulated business justification.'"); Myers v. Martin (In re Martin), 91 F.3d 389,

3    395 (3d Cir.1996); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir.1986) (authorizing

4    sale of debtor's assets pursuant to section 363 "when a sound business purpose dictates such

5    action") (citation omitted).  A sound business purpose for the sale of a debtor's assets outside the

6    ordinary course of business may be found where such a sale is necessary to preserve the value of

7    assets for the estate, its creditors, or interest holders.  See, e.g., In re Abbotts Dairies of Pa, Inc., 788

8    F.2d 143 (3d Cir.1986).

9         Once the debtor has articulated a valid business justification, a presumption arises that the

10   debtor's decision was made on an informed basis, in good faith, and in the honest belief the action

11   was in the best interest of the company.  See In re Integrated Resources, Inc., 147 B.R. 650, 656

12   (S.D.N.Y. 1992).  Furthermore, once "the debtor articulates a reasonable basis for its business

13   decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

14   entertain objections to the debtor's conduct."  Agarwal v. Pomona Valley Med. Group, Inc. (In re

15   Pomona Valley Med. Group, Inc.), 476 F.3d 665, 670 (9th Cir.2007); In re Chi-Feng Huang, 23 B.R.

16   798, 801 (B.A.P. 9th Cir.1982); Pacific Shores Development, LLC v. At Home Corp. (In re At Home

17   Corp.), 292 B.R. 195, 199 (N.D.Cal. 2003); In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr.

18   S.D.N.Y. 1986).  Thus, if a debtor's actions satisfy the business judgment rule, the actions in question

19   should be approved under section 363(b)(1).

20        Debtor has a sound business justification for selling the Sale Assets.  First, Debtor believes

21   that the Sale(s) will maximize the Sale Assets going-concern value by allowing a party to bid on

22   business assets that have a greater value as a going-concern.  In addition, Debtor's sale of the Sale

23   Assets on the timeline proposed would ensure that the Debtor can maintain its limited business

24   operations and the value of its assets prior to a Closing, thereby maximizing value for the benefit of

25   the estate.  See Myles Declaration, ¶ 33.

26        Further, the sale of the Sale Assets will be subject to an open auction with a minimum of

27   barriers to entry, ensuring that the value of the Sale Assets will be tested through the Auction

28   conducted pursuant to and according to the Bidding Procedures.  Ultimately, the Successful Bid,

being subject to a "market check," will constitute the highest or otherwise best offer for the Sale Assets and will provide a greater recovery for the estate and creditors than any available alternative. See, e.g., In re Trans World Airlines, Inc., No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D.Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arms-length fair value transaction"); see also Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999) (where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market). As such, Debtor submits that the Auction process with the LVCVA as the proposed purchaser pursuant to the Stalking Horse Agreement will be a valid and sound exercise of the Debtor's business judgment. See Myles Declaration, ¶¶ 34-35.

**B.** **The Bidding Procedures Are Appropriate and Will Maximize Value.**

    **1.** **The Bidding Procedures are Reasonable and Appropriate and Should be Approved as a Sound Exercise of Debtor's Business Judgment.**

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir.2004); see also In re Food Barn Stores, Inc., 101 F.3d 558, 564-65 (8th Cir.1997). Accordingly, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. See, e.g., In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir.1999); Integrated Resources, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. See, e.g., Schipper, 933 F.2d at 515 ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); see also Integrated Resources, 147 B.R. at 656-57 (noting that bidding procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such

procedures and arrangements are "presumptively valid").

Debtor believes that the proposed Bidding Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best offers available for the Sale Assets. See Myles Decl., ¶ 36. The Bidding Procedures provide potential bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid, and enable Debtor to conduct the Sale(s) in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the highest or best consideration for the Sale Assets. See id., ¶ 37. Thus, Debtor submits that the Bidding Procedures are reasonable, appropriate, and within the Debtor's sound business judgment under the circumstances of this Chapter 11 Case. See id., ¶ 38.

### 2. Credit Bidding Should Be Authorized Pursuant to Section 363(k).

A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest under Section 363(k) of the Bankruptcy Code, which provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Accordingly, Debtor submits that UMB and the SBA should have the right to credit bid any amount outstanding due under the Conduit Loan and EIDL Loan, respectively. See id., ¶ 39.

### 3. The Bidding Protections Should be Approved.

Debtor seeks authority to provide the Stalking Horse Protections to LVCVA in connection with the Sale. The ability to provide such bid protections is beneficial to the estate and creditors because it encourages submission of a stalking horse bid, thereby setting a floor for further bidding, and will induce potential bidders to submit or increase their bids prior to the Auction. To the extent bids can be improved prior to the Auction, a higher floor is established. See id., ¶ 40.

LVCVA, as the proposed stalking horse bidder, has expended time and resources negotiating, drafting, and performing due diligence activities to arrive at the Stalking Horse Agreement and the Redemption Agreement, and the Stalking Horse Agreement will be subject not

only to Bankruptcy Court approval, but also to overbidding by third parties. <u>See</u> Myles Decl., ¶ 41.

Break-up fees and other forms of bidding protections are a normal and, in many cases, a necessary component of significant sales conducted pursuant to section 363 of the Bankruptcy Code. <u>Integrated Resources</u>, 147 B.R. at 659-60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."). Bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." <u>In re 995 Fifth Ave. Assocs., L.P.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989); <u>see also</u> <u>Integrated Resources</u>, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); <u>In re Hupp Int'l Indus., Inc.</u>, 140 B.R. 191, 194 (Bankr. N.D.Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence."). As a result, courts routinely approve bid protections similar to the bid protections proposed here in connection with proposed bankruptcy sales.

**C.    Sales Free and Clear of Liens, Claims, Interests, and Encumbrances are Authorized and Appropriate Under Section 363(f) of the Bankruptcy Code.**

Subject to the definitive terms of a the Stalking Horse Agreement, Debtor is requesting approval to sell the Sale Assets on an "as is" basis, free and clear of any liens, claims, interests, and/or encumbrances in accordance with Section 363(f) of the Bankruptcy Code, including any successor liability claims and any terms of an executory contract or unexpired lease or other contract or agreement that prohibit, restrict, or condition assignment.

A debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money

1    satisfaction of such interest.  11 U.S.C. § 363(f); In re Kellstrom Indus., Inc., 282 B.R. 787, 793

2    (Bankr. D.Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct

3    the sale free and clear of all liens.").

4         UMB and the SBA have perfected liens against the Sale Assets, and they will be adequately

5    protected by having their liens attach to the sale proceeds from the sale of the Sale Assets to the

6    Successful Bidder, in the same order of priority, with the same validity, force and effect that such

7    creditor had prior to such sale, subject to any claims and defenses Debtor and its estate may possess

8    with respect thereto.  See Myles Decl., ¶ 42.

9         Moreover, courts have consistently held that a buyer under a Section 363 sale takes free of

10   pre-existing claims of all kind, which bars successor liability claims.  See Folger Adam Security v.

11   DeMatteis/MacGregor JV, 209 B.R. 252, 257 (3d Cir.2000); In re Leckie Smokeless Coal Co., 99

12   F.3d 573, 581-82 (4th Cir.1996); The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195

13   B.R. 716, 732 (Bankr. N.D.Ind. 1996) (stating that a bankruptcy court has the power to sell assets

14   free and clear of any interest that could be brought against the bankruptcy estate during the

15   bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-

16   94 (2d Cir.1988) (channeling of claims to proceeds consistent with intent of sale free and clear under

17   section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr.

18   W.D.Wash. 1982) (transfer was free and clear sale of Title VII employment discrimination and civil

19   rights claims of debtor's employees); WBQ P'ship v. Virginia Dept. of Medical Assistance Services

20   (In re WBQ P'ship), 189 B.R. 97, 104-05 (Bankr E.D.Va. 1995) (right to recapture depreciation is

21   an "interest" as used in section 363(f)).

22        Likewise, Section 365(f)(1) permits a debtor to assign unexpired leases and contracts free

23   from such anti-assignment restrictions, providing, in pertinent part, that: "notwithstanding a

24   provision in an executory contract or unexpired lease of the debtor, or in applicable law, that

25   prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign

26   such contract or lease under paragraph (2) of this subsection…"  11 U.S.C. § 365(f)(1). See Coleman

27   Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997)

28   ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend

their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"); <u>see also</u> 11 U.S.C. § 365(f)(3) (prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof); <u>In re Jamesway Corp.</u>, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (§ 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

Accordingly, Debtor requests that the Sale be approved free and clear of any liens, claims, interests, and encumbrances, including pre-existing claims of all kind, successor liability, and anti-assignment provisions of any Assigned Contract.  <u>See</u> Myles Decl., ¶ 43.

**D.    The Successful Bidder Will Be a "Good-Faith Purchaser" Under Section 363(m).**

Debtor requests that the Court find that the Successful Bidder is entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in the Sale Order.

Section 363(m) of the Bankruptcy Code protects the purchaser of assets sold pursuant to a sale under Section 363 from the risk that it will lose its interest in the Sale Assets if the order allowing the sale is reversed on appeal, as long as such purchased or leased or purchased the assets in "good faith."   While the Bankruptcy Code does not define "good faith," courts have held that "the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  <u>Abbotts Dairies of Pa.</u>, 788 F.2d at 147; <u>In the Matter of Andy Frain Servs., Inc.</u>, 798 F.2d 1113 (7th Cir.1986) (same); <u>In re Sasson Jeans, Inc.</u>, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

The Stalking Horse Agreement was the result of extensive arms-length, good-faith negotiations culminating from Debtor's competitive market process, during which all parties were represented by competent counsel, and is free from fraud, collusion, or any attempt to take unfair advantage of other bidders.  <u>See</u> Myles Declaration, ¶ 44.  Further, any Sale that results from the Auction conducted in accordance with the Bidding Procedures will be the result of the marketing

1    process and arms-length negotiations conducted in good faith, free from fraud, collusion, or unfair

2    advantage.  See Myles Decl., ¶ 45.  Accordingly, Debtor submits that any Successful Bidder arising

3    from the Auction will be a "good faith purchaser" entitled to the protections of Section 363(m) of

4    the Bankruptcy Code, and the resulting Sale(s) will not be avoidable under Section 363(n) of the

5    Bankruptcy Code.

6    **E.**        **Assumption and Assignment of Contracts.**

7            To facilitate and effectuate the sale of the Sale Assets, the Debtor seeks the authority, but not

8    the direction, to assume and assign, or, alternatively, reject any of the Contracts as part of a sale

9    transaction for any of the Sale Assets as required by the Successful Bidder.  The Bidding Procedures

10   specify the process by which Debtor will serve the Cure Notice and the Assumption and Assignment

11   Notice, along with the procedures and deadline for counterparties to Assumed Contracts to file and

12   serve objections.

13           Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the

14   Court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11

15   U.S.C. § 365(a).  Similar to Section 363(b)(1), the standard to be applied by a court in determining

16   whether an executory contract or unexpired lease should be assumed or rejected is the "business

17   judgment" test, which is premised on the debtor's business judgment that assumption would be

18   beneficial to the estate.  See In re Pomona Valley Med. Group, 476 F.3d at 670; In re ANC Rental

19   Corp., Inc., 277 B.R. 226, 238 (Bankr. D.Del. 2002) ("In order to assume . . . an executory contract

20   . . . the debtor must establish that the decision is one made in its sound business judgment.") (citing

21   In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D.Del. 1999)).  In applying the "business

22   judgment" standard, courts show substantial deference to the debtor's business judgment—

23   assumption or rejection should only be disapproved when the action is so manifestly unreasonable

24   that it could not be based on sound business judgment, but only on bad faith, whim, or caprice.  See

25   Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D.Utah 1981).

26           Here, the Assumed Contracts are necessary to the day-to-day operation of the Sale Assets

27   and, as such, the power to assume and assign the Assumed Contracts is essential to inducing the best

28

4840-7221-3703, v. 3

offer for the Sale Assets. The Assumed Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bidding Procedures Order and, therefore, will be reviewed by key constituents in the Chapter 11 Case. See Myles Declaration, ¶ 46.

A debtor-in-possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993). Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

Debtor submits that the procedures set forth in the Bidding Procedures Order give the parties to the relevant Assumed Contracts notice of the Bidders and an opportunity to object to adequate assurance, and thereby satisfy Bankruptcy Rule 6006. Accordingly, Debtor submits that the assumption and assignment of the Assumed Contracts as set forth herein should be approved.

**F.** **Appointment of a Consumer Privacy Ombudsman is Not Required by Sections 332 and 363(b)(1) of the Bankruptcy Code.**

Under Sections 363(b)(1) and 332(a) of the Bankruptcy Code, the consumer privacy ombudsman provisions applicable to sales of personally identifiable information apply only if three elements are met. First, the debtor must have disclosed a privacy policy to the individual in connection with offering the good or service. Second, the privacy policy must prohibit the transfer of the personally identifiable information to non-affiliate parties. Third, the privacy policy must be in effect on the date of the commencement of the bankruptcy case. See Warren E. Agin, Handling

1  *Customer Data in Bankruptcy Mergers and Acquisitions Coping with the Consumer Privacy*

2  *Ombudsman Provisions of Bapcpa*, Am. Bankr. Inst. J., July/August 2005, at 1, 59 (2005).

3  　　　Here, the appointment of a consumer privacy ombudsman is not required.  Debtor does not

4  deal directly with individual consumers in offering goods or services.  Debtor has not disclosed a

5  privacy policy to any individual in connection with offering a good or service.  Indeed, Debtor neither

6  had such a policy pre-petition, nor when the Chapter 11 Case was commenced.  Accordingly, Debtor

7  submits that the appointment of an ombudsman is not necessary in connection with the sale of the

8  Sale Assets.  See Myles Declaration, ¶ 47.

9  **G.**　　**Notice of the Bidding Procedures and the Sale Process Is Sufficient.**

10  　　　Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the

11  proposed sale of the Sale Assets, including a disclosure of the time and place of any auction, the

12  terms and conditions of a sale, and the deadline for filing any objections.

13  　　　The Debtor respectfully submits that the Sale Notice is reasonably calculated to provide all

14  interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time,

15  and place of the Auction (if one will be held); (b) the Bidding Procedures; (c) the deadline for filing

16  objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing;

17  (d) a reasonably specific identification of the Sale Assets; (e) a description of the Sale as being free

18  and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests,

19  and other encumbrances attaching with the same validity and priority to the Sale proceeds; and

20  (f) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful

21  Bidder.

22  　　　Debtor further submits that notice of this Motion and the related hearing to consider entry of

23  the Bidding Procedures Order, coupled with service of the Sale Notice, the Cure Notice, and the

24  Assumption and Assignment Notice, as provided for herein, constitutes good and adequate notice of

25  the Sale(s) and the proceedings with respect thereto in compliance with, and satisfaction of, the

26  applicable requirements of Bankruptcy Rule 2002.  Accordingly, Debtor respectfully requests that

27  the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no

28

other or further notice of the Bidding Procedures, Auction, Sale, or Sale Hearing is required.

**H.    The Requirements of Bankruptcy Rule 6003 Have Been Satisfied and Bankruptcy Rule 6004(h) is Properly Waived.**

Bankruptcy Rule 6003(b) provides "except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before filing of the petition. . . ." As described above and in the Myles Declaration, if this Motion is not granted, Debtor will experience immediate and irreparable harm. See Myles Declaration, ¶ 48. To ensure Debtor's chances of successfully maximizing value for Debtor's estate and creditors, this Court should find that the exception set forth in Bankruptcy Rule 6003 applies in this Chapter 11 Case.

Moreover, Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Under the facts and circumstances of the case, including the need to close a sale by November 30, 2020, Debtor requests that any order approving a Sale and the assumption and assignment of any Assigned Contracts waive the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) and be effective immediately upon entry. See id., ¶ 49.

## VI.    CONCLUSION

WHEREFORE, Debtor respectfully requests that this Court: (1) enter a Bidding Procedures Order, substantially in the form attached as **Exhibit 1**, approving bidding procedures for the sale of the Sale Assets and the over-bid protections for the LVCVA, setting an auction and sale hearing date, and approving notices and other relief related to the foregoing; (2) following a final hearing, entry of one or more orders, authorizing and approving sales free and clear of all liens (statutory or otherwise), claims, interests, and encumbrances of every kind and nature with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds, the assumption and assignment of related executory contracts and unexpired leases, and waiving of

1  the requirements of Bankruptcy Rules 6004(h) and 6006(d); and (3) grant such other and further

2  relief as is just and proper.

3  Dated September 7, 2020                    GARMAN TURNER GORDON LLP

4

5                                           By:  */s/ Mark M. Weisenmiller*
                                                 GERALD M. GORDON
6                                                MARK M. WEISENMILLER
                                                 7251 Amigo Street, Suite 210
7                                                Las Vegas, Nevada 89119
                                                 Telephone (725) 777-3000
8                                                Facsimile (725) 777-3112
                                                 *[Proposed] Attorneys for Debtor*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28